Nos. 2021-2066 & 2021-2252

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PRIMESOURCE BUILDING PRODUCTS, INC.,
*Plaintiff-Appellee*

v.

UNITED STATES, JOSEPH R. BIDEN, JR., President of the United States, GINA M. RAIMONDO, Secretary of Commerce, TROY MILLER, Acting Commissioner of the United States Customs and Border Protection, UNITED STATES CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF COMMERCE,
*Defendants-Appellants*

OMAN FASTENERS, LLC, HUTTIG BUILDING PRODUCTS, INC., and HUTTIG, INC.,
*Plaintiffs-Appellees,*

v.

UNITED STATES, JOSEPH R. BIDEN, JR., President of the United States, UNITED STATES CUSTOMS AND BORDER PROTECTION, TROY MILLER, Acting Commissioner of the United States Customs and Border Protection, DEPARTMENT OF COMMERCE, GINA M. RAIMONDO, Secretary of Commerce,
*Defendants-Appellants*

Appeals from the United States Court of International Trade in Case Nos. 20-00032, 20-00037, and 20-00045, Senior Judge Timothy C. Stanceu & Judge Jennifer Choe-Groves (for the majority), and Judge M. Miller Baker (in dissent)

## PETITION FOR REHEARING *EN BANC* OF PLAINTIFFS-APPELLEES

Michael P. House
Andrew Caridas
**PERKINS COIE LLP**
700 Thirteenth Street, NW
Washington, DC 20005
(202) 654-1736

*Counsel for Plaintiffs-Appellees Oman Fasteners, LLC, Huttig Building Products, Inc. and Huttig, Inc.*

Jeffrey S. Grimson
Bryan P. Cenko
**MOWRY & GRIMSON, PLLC**
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015
(202) 688-3610

*Counsel for Plaintiff-Appellee PrimeSource Building Products, Inc.*

**April 24, 2023**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**     2021-2066

**Short Case Caption**     PrimeSource Building Products, Inc. v. United States

**Filing Party/Entity**     Oman Fasteners, LLC, Huttig Building Products, Inc. and Huttig, Inc.

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/24/2023

Signature:     /s Andrew Caridas

Name:     Andrew Caridas

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Oman Fasteners, LLC | | Guerrero International LLC |
| Huttig Building Products, Inc. | | Woodgrain, Inc. |
| Huttig, Inc. | | Huttig Building Products, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Jon B. Jacobs, Perkins Coie, LLP | Brenna P. Duncan, Perkins Coie LLP | Shuaiqi Yuan, Perkins Coie LLP |
| | | |
| | | |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| PrimeSource Building Products, Inc. v. United States, Cons. Appeal No. 21-2066 | Transpacific Steel LLC v. United States, 4 F.4th 1306 (Fed. Cir. 2021), petition for cert. filed, (U.S. Nov. 16, 2021) (No. 21-721) | USP Holdings, Inc. v. United States, Appeal No. 21-1726 |
| Approx. 10 Ct. of Int'l Trade cases challenging Proclamation 9980, including the following: | J. Conrad LTD v. United States, Court No. 20-52 (Ct. Int'l Trade) | Metropolitan Staple Corp. v. United States, Court No. 20-53 (Ct. Int'l Trade) |
| Approx. 10 Ct. of Int'l Trade cases challenging Proclamation 9772, including the following: | Tata Metals (Am.) Ltd. v. United States, Court No. 20-19 (Ct. of lnt'l Trade) | Acemar Intermetal USA LLC v United States, Court No. 20-129 (Ct. Int'l Trade) |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| **Case Number** | 21-2066 |
|---|---|
| **Short Case Caption** | PrimeSource Building Products, Inc. v. US |
| **Filing Party/Entity** | PrimeSource Building Products, Inc. |

> **Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/24/2023

Signature: /s/ Jeffrey S. Grimson

Name: Jeffrey S. Grimson

FORM 9. Certificate of Interest

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| PrimeSource Building Products, Inc. | N/A | PriSo Acquisition Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable     ☐   Additional pages attached

| | | |
|---|---|---|
| James C. Beaty<br>Curtis, Mallet-Prevost, Colt & Mosle LLP<br>1717 Pennsylvania Avenue NW #1300, Washington, DC 20006 | Wenhui (Flora) Ji<br>Akin Gump Strauss Hauer & Feld LLP<br>2001 K St. NW, Washington, DC 20006 | |
| | | |
| | | |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐   None/Not Applicable     ☑   Additional pages attached

| | | |
|---|---|---|
| Oman Fasteners, LLC v. United States, Cons. Appeal No. 21-2066 (Fed. Cir.) | USP Holdings, Inc. v. United States, Appeal No. 21-1726 (Fed. Cir.) | |
| Approx. 12 Ct. of Int'l Trade cases challenging Proclamation 9980, including the following: | Astrotech Steels Private Ltd. v. United States, No. 20-46 (Ct. Int'l Trade) | Trinity Steel Private Ltd. v. United States, No. 20-47 (Ct. Int'l Trade) |
| New Supplies Co., Inc., et al., v. United States, No. 20-48 (Ct. Int'l Trade) | Aslanbas Nail & Wire Co., et al., v. United States, No. 20-49 (Ct. Int'l Trade) | J. Conrad LTD v. United States, Court No. 20-52 (Ct. Int'l Trade) |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable     ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐   None/Not Applicable          ☑   Additional pages attached

| | | |
|---|---|---|
| Metropolitan Staple Corp. v. United States, Court No. 20-53 (Ct. Int'l Trade) | SouthernCarlson, Inc., et al., v. United States, No. 20-56 (Ct. Int'l Trade) | Tempo Global Resources, LLC v. United States, No. 20-66 (Ct. Int'l Trade) |
| Farrier Product Distribution, Inc. v. United States, No. 20-98 (Ct. Int'l Trade) | Geekay Wires Ltd. v. United States, No. 20-118 (Ct. Int'l Trade) | Hilti, Inc. v. United States, No. 21-216 (Ct. Int'l Trade) |
| Home Depot USA, Inc. v. United States, No. 22-14 (Ct. Int'l Trade) | Approx. 3 Ct. of Int'l Trade cases challenging Proclamation 9772, including the following: | Acemar Intermetal USA LLC v United States, Court No. 20-129 (Ct. Int'l Trade) |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☐   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable        ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐   None/Not Applicable        ☐   Additional pages attached

| ME Global, Inc. v. United States, No. 20-130 (Ct. Int'l Trade) | Intermetal Rebar LLC v. United States, No. 20-167 (Ct. Int'l Trade) |  |
|---|---|---|
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☐   None/Not Applicable        ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page**

Statement of Counsel Pursuant to Rule 35(b) ........................................................ 1

Introduction ........................................................................................................ 1

Background ......................................................................................................... 2

I.    Section 232 .................................................................................................. 2

II.   The Steel Report and Proclamation 9705 .................................................... 4

III.  This Court's decision in *Transpacific* ........................................................ 6

IV.   Proclamation 9980 ...................................................................................... 6

Argument ............................................................................................................ 7

I.    The panel ignored the plain language of Section 232 .................................. 7

II.   The panel abandoned the limitations on presidential power implicit in
      *Transpacific* ............................................................................................... 8

      A.   The panel stretched *Transpacific*'s "continuing course of action" past
           the breaking point ............................................................................... 9

      B.   The panel sidestepped *Transpacific*'s insistence that subsequent
           presidential action cannot depart from the "key findings" in the
           Steel Report ........................................................................................ 12

      C.   The panel nullified *Transpacific*'s concerns about "staleness" .................. 14

III.  The panel's extension of *Transpacific* creates an unconstitutional
      delegation of legislative power .................................................................. 15

Conclusion .......................................................................................................... 19

Certificate of Compliance with Type-Volume Limitation ...................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Federal Energy Administration v. Algonquin SNG, Inc.,*
    426 U.S. 548 (1976) ...................................................................... 16-18

*Shelby Cty. v. Holder,*
    570 U.S. 529 (2013) ......................................................................... 18

*Touby v. United States,*
    500 U.S. 160 (1991) .......................................................................... 17

*Transpacific Steel LLC v. United States,*
    4 F.4th 1306 (Fed. Cir. 2021) ............................................. 1, 2, 6, 8-10, 12, 14, 16

*United States v. George S. Bush & Co.,*
    310 U.S. 371 (1940) ......................................................................... 16

STATUTES

19 U.S.C. § 1862 ..................................................................... 3, 4, 7, 8, 10, 11, 16

REGULATIONS

Presidential Proclamation 3279, *Adjusting Imports of Petroleum and Petroleum Products Into the United States,*
    24 Fed. Reg. 1781 (Mar. 12, 1959) ...................................................... 18

Presidential Proclamation 4341, *Modifying Proclamation 3279, Relating to Imports of Petroleum and Petroleum Products, and Providing for the Long-Term Control of Imports of Petroleum and Petroleum Products Through a System of License Fees,* 40 Fed. Reg. 3965 (Jan. 27, 1975)...................................... 18

Presidential Proclamation 9772, *Adjusting Imports of Steel into the United States,* 83 Fed. Reg. at 40,429 (Aug. 10, 2018) ...................................... 10

OTHER AUTHORITIES

U.S. Const. art. 1, § 8 ........................................................................ 2

## STATEMENT OF COUNSEL PURSUANT TO RULE 35(b)

Based on our professional judgment, we the undersigned believe this appeal requires an answer to the following precedent-setting question of exceptional importance:

Whether Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, permitted the President of the United States to impose a tariff on steel nails and other derivative articles of steel more than two years after the Secretary of Commerce issued the relevant Section 232 report, even though neither that report nor any of the President's prior actions pursuant to that report included derivative articles.

/s/ Michael P. House
Michael P. House

*Counsel for Plaintiffs-Appellees Oman Fasteners, LLC, Huttig Building Products, Inc. and Huttig, Inc.*

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson

*Counsel for Plaintiff-Appellee PrimeSource Building Products, Inc.*

## INTRODUCTION

Plaintiffs-Appellees petition for rehearing *en banc* because, rather than strictly adhering to this Court's prior decision in *Transpacific Steel LLC v. United States* ("*Transpacific*"), 4 F.4th 1306, 1310 (Fed. Cir. 2021)—a decision that itself arguably expanded the President's power under Section 232 beyond what the Constitution

can bear—the panel instead stripped away all of the reservations expressed in *Transpacific* and doubled down on an unlawful expansion of the President's Section 232 powers.

In Proclamation 9980, the President sought to impose 25 percent tariffs on a different group of imports—steel nails and a handful of other derivative products made from steel—based on a two-year-old report issued by the Secretary of Commerce. That report, which concluded that imports of primary steel produced in steel mills threatened to impair national security, never mentioned derivative products, much less the *specific* derivative products covered by Proclamation 9980.

If the Panel's decision stands, the President will enjoy unbounded legislative power to regulate foreign trade—to take *any* action, at *any* time, targeting *any* imported product, so long as at *any point* in the past, the Secretary made a threat determination regarding *either* the targeted product or any material used to make that product. Given its profound expansion of the Executive's power, this case merits rehearing by the Court *en banc.*

## BACKGROUND

### I.    SECTION 232

The Constitution provides that "The Congress shall have Power ... [t]o regulate Commerce with foreign Nations." U.S. Const. art. 1, § 8. Congress enacted

Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862 ("Section 232"), under that exclusive power. Section 232 delegates to the President the power to "adjust the imports of [an] article and its derivatives" when that article is entering the United States "in such quantities or under such circumstances as to threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A).

Before the President can act, the Secretary of Commerce ("Secretary") must investigate "to determine the effects on the national security of imports of the article" in question and transmit to the President a "report on the findings of such investigation" in which the Secretary makes "recommendations ... for action or inaction" by the President. *Id.* § 1862(b)(3)(A).

"Within 90 days after receiving" a Section 232 report in which the "Secretary finds ... [a] threat[ ] to ... the national security," the "the President shall determine ... whether [he] concurs with the finding of the Secretary," and "determine the nature and duration of the action that ... must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." *Id.* § 1862(c)(1)(A)(ii). If the President determines that action must be taken to adjust imports or derivatives of the article, "the President shall implement that action by no later than the date that is 15 days after the day on which the President determines to take action." *Id.* § 1862(c)(1)(B). In addition, "no later than the

– 3 –

date that is 30 days after" making the determination on whether to take action, "the President shall submit to the Congress a written statement of the reasons" for any chosen action or inaction. *Id.* § 1862(c)(2).

## II.   THE STEEL REPORT AND PROCLAMATION 9705

On January 11, 2018, the Secretary issued a Section 232 report finding that steel was being imported in such quantities and circumstances as to threaten national security. Appx769-1031. The Steel Report covered "steel mill products," *i.e.* *primary* articles of steel. Appx793-794. The Steel Report did not mention steel nails or any other *derivative* articles of steel—*i.e.*, downstream articles manufactured from steel. In fact, the word "derivative" appears only once in the 61-page Steel Report, in a quote of the statutory text. Appx785. Nor did any of the comments submitted during the public-comment period specifically advocate for the tariff to be applied to imported steel nails. *See* Appx769-1031. "Nails" appear only once in the Steel Report, in a list of civilian articles made from cold finished steel bar. Appx977. Moreover, while the Steel Report, refers to antidumping/countervailing duty actions on "unfairly traded steel products," Appx258, and purports to list all antidumping and countervailing duty cases on "steel," Appx1018-1021, it omits any of the numerous antidumping/countervailing duty cases on nails. "Nails" were similarly not discussed in the public hearing that preceded the Steel Report. *See* Appx490-674.

The Steel Report recommended that the President take action to adjust the level of steel imports through either quotas or tariffs. Appx830-833. It proposed, as alternatives, a "global" tariff "on all imported steel products," with a recommended tariff rate of 24 percent, or "tariffs on a subset of countries" which would apply to "all imported steel products from" certain specific countries with a recommended tariff rate of 53 percent. Appx831-832.

In response, the President issued Proclamation 9705 in March 2018, within the 90 days prescribed by Section 232. The President "concur[red] in the Secretary's finding[s]" and "considered [the Secretary's] recommendations." Appx686. The President hewed close to those recommendations by imposing a global tariff of 25 percent on imports of steel from all countries except Canada and Mexico. Appx686-687. The President also "welcome[d]" U.S. allies "to discuss with the United States alternative ways to address the threatened impairment of the national security," and explained that if these discussions proved fruitful, he "may remove or modify the restriction on steel articles imports from that country and, if necessary, make any corresponding adjustments to the tariff as it applies to other countries as our national security interests require." *Id.*

The "steel articles" included in Proclamation 9705 are identical to the "steel mill products" included within the scope of the Steel Report. Appx688. As in the Steel Report, the word "derivative" appears only once in Proclamation 9705, in a summary of Section 232. Appx687.

## III. THIS COURT'S DECISION IN *TRANSPACIFIC*

In *Transpacific*, a split panel of this Court held that the President did not violate Section 232 by increasing the 25 percent "global" tariff on steel to 50 percent for Turkey four months later. The majority deemed that action legal, despite being taken after the statutory deadline, because it was part of "a continuing course of action [initiated by Proclamation 9705] within the statutory time period." 4 F.4th at 1318–19. But the majority noted that its opinion was narrow and did "not address other circumstances that would present other issues about presidential authority to adjust initially taken actions without securing a new report with a new threat finding from the Secretary." *Id.* at 1310.

## IV. PROCLAMATION 9980

On January 24, 2020, the President issued Proclamation 9980, imposing 25 percent tariffs on a handful of derivative articles made of steel, including steel nails. Appx758. No new Section 232 investigation and report supported that action. Rather, the President claimed a continuing authority to adjust imports of additional

products in response to the Steel Report, even though the Steel Report was more than two years old and had addressed only the impact of imported primary steel. *See* Appx750.

## ARGUMENT

### I. THE PANEL IGNORED THE PLAIN LANGUAGE OF SECTION 232

The text of the statute is clear: the President "shall," within 90 days of receiving the Secretary's report, determine whether he agrees with the report and determine the nature and duration of any action necessary "so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii). If the President decides to act, he "shall implement that action" within 15 days of determining that the action is warranted. *Id.* § 1862(c)(1)(B). The President "shall" also, within 30 days of determining whether to act, submit to Congress a written statement of the reasons for the chosen action or inaction. *Id.* § 1862(c)(2).

"[T]he action" and "that action" do not mean "series of actions" or "plan of action." Congress was perfectly capable of using the plural in Section 232 when appropriate. Specifically, under circumstances indisputably not present here—and under *only* those circumstances—paragraph (c)(3) of the statute authorizes the President to take "such *other actions* as the President deems necessary." 19 U.S.C. § 1862(c)(3)(A) (emphasis added). Interpreting "the action" to encompass an

unlimited number of actions renders meaningless (1) the requirement that the President determine both the "nature" and especially the "duration" of "the action" chosen, *id.* § 1862(c)(1)(A)(ii), (2) the requirement that the President provide Congress a statement of the reasons for such action within 30 days of making that determination, *id.* § 1862(c)(2), and (3) Congress's narrow delegation of power for the President to take subsequent "actions" in paragraph (c)(3). *Id.* § 1862(c)(3).

The panel's contrary ruling rewrites those statutory guardrails to hold that the President must merely declare and implement *some* action within Congress's stated deadlines, thereby allowing the President unlimited power to take different actions in the future. As the Court of International Trade's reviewing panel rightly concluded, Appx26, Congress never intended such an outcome.

## II.   THE PANEL ABANDONED THE LIMITATIONS ON PRESIDENTIAL POWER IMPLICIT IN *TRANSPACIFIC*

The panel incorrectly concluded that *Transpacific* dictated its decision. The holding in *Transpacific* was narrow, expressly limited by the majority to "the[ ] circumstance" of that case. 4 F.4th at 1310. The panel's decision here dramatically extended *Transpacific*, doing far greater violence to the procedural safeguards Congress built into Section 232.

## A.    The panel stretched *Transpacific*'s "continuing course of action" past the breaking point

In *Transpacific*, the majority concluded that Proclamation 9772 was lawful because it was part of "a continuing course of action [initiated] within the statutory time period." *Id.* at 1318–19. Specifically, the President had timely announced a plan of action "to adjust the imports of steel articles by imposing a 25 percent ad valorem tariff" in Proclamation 9705. *Id.* at 1314. This "plan of action" "imposed some tariffs immediately, announced negotiations with specified nations in lieu of immediate tariffs, invited negotiations more broadly, and stated that the immediate measures might be adjusted as necessary." *Id.* at 1310. Shortly thereafter, Proclamation 9772 "modif[ied] the initial implementing steps in line with the announced plan of action" by increasing the duty applicable to Turkish imports of the same primary steel articles. *Id.* at 1319.

If Proclamation 9705 permissibly initiated a "plan of action" to "adjust the imports of steel articles" via tariff, *id.* at 1314, the subsequent presidential actions examined in *Transpacific* merely "adjusted" that tariff, generally in response to "negotiations with specified nations." *Id.* at 1314–16. These were exactly the kind of subsequent steps in the "plan of action" announced in Proclamation 9705. When (1) the President's initial action is the "negotiation of an agreement which limits or restricts the importation ... of the article that threatens to impair national security," and

(2) "such an agreement ... is ineffective in eliminating the threat," Section 232 explicitly allows the President to "take such other actions as the President deems necessary to adjust the imports of such article so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(3)(A). In Proclamation 9705, the President expressed "willingness to negotiate with 'any country' that ha[d] 'a security relationship with the United States in order to discuss 'alternative ways to address the threatened impairment of national security caused by imports from that country.'" *Transpacific*, 4 F.4th at 1314. Proclamation 9705 also contemplated that such negotiations make it "necessary" to "adjust" the steel tariffs imposed on certain countries. *Id.* at 1310.

Proclamation 9772 was also consistent with the Secretary's findings and recommendations in the Steel Report, which "recommended that [the President] consider applying a higher tariff to a list of specific countries [including Turkey] should [he] determine that all countries should not be subject to the same tariff." 83 Fed. Reg. at 40,429. As *Transpacific* noted, the actions after Proclamation 9705 chiefly concerned negotiations that resulted in exempting specific countries from the global 25 percent tariff imposed by Proclamation 9705. 4 F.4th at 1314–15. And because the President determined through those negotiations that "all countries should not

be subject to the same tariff," he doubled the tariff on Turkish primary steel. *Id.* at 1315–16.

Proclamation 9980 did *not* continue Proclamation 9705's plan of action. It did not "adjust" the tariff imposed by Proclamation 9705 on *primary* steel articles. It imposed a *new* 25 percent tariff on a different group of imports: *derivative* steel articles. Appx750. Derivative articles were not discussed in either the Steel Report or Proclamation 9705. Thus, "[r]ather than upwardly adjust the tariffs imposed by a previous Section 232 proclamation, the action contested here imposed, for the first time, tariffs of 25% on a previously unaffected group of products." Appx70.

Nor could Proclamation 9980 be justified based on the President's authority to later take "other actions" in response to negotiations with one or more countries. 19 U.S.C. § 1862(c)(3)(A). First, paragraph (c)(3) provides authority to take additional actions only "to adjust the imports of such article" that is the subject of the negotiations. *Id.* Unlike the broader, but time-limited, authority to act granted by paragraph (c)(1), paragraph (c)(3) does *not* authorize action "to adjust imports of the article *and its derivatives.*" The United States engaged in no negotiations regarding derivative articles of steel, and Proclamation 9980 mentions none. Second, as explained above, the possibility that tariffs might later be imposed on derivative articles was contemplated in neither Proclamation 9705 nor the Steel Report.

– 11 –

Despite these critical differences, the panel concluded that Proclamation 9980 was part of the same "'continuing course of action'" discussed in *Transpacific* because it "'add[ed] impositions on imports to achieve the stated implementation objective.'" Panel Op. 10 (quoting *Transpacific*, 4 F.4th at 1318–19). But as explained above, *Transpacific* involved the President's decision to increase the *existing* duty on Turkish primary steel to offset the effects of reductions on the previously implemented duties on primary steel from other countries—as specifically contemplated in both Proclamation 9705 and the Steel Report. The panel thus redefined "plan of action" to encompass any new trade restrictions, so long as the President claims to pursue the same broad economic objectives as Proclamation 9705.

## B.  The panel sidestepped *Transpacific*'s insistence that subsequent presidential action cannot depart from the "key findings" in the Steel Report

*Transpacific* also upheld Proclamation 9772 because of its "adherence to the [Steel Report's] key finding of a need for a certain [steel] capacity-utilization level" and "excess of [steel] imports overall, from numerous countries, that left domestic [steel] capacity utilized less than [that] identified, plant-sustaining level." 4 F.4th at 1323. That did not permit subsequent proclamations "that make[ ] no sense except on premises that depart from the Secretary's finding." *Id.* Yet Proclamation 9980 involves derivative articles of steel that were not even considered in the Steel

Report. The Steel Report did not recommend taking any action with respect to derivatives—much less the specific derivative articles in Proclamation 9980.

The panel concluded that "the fact that the Secretary's 2018 report and Proclamation 9705 did not address the effect of imports of derivatives is immaterial," because Section 232 allows "[t]he President [to] take action against derivative products regardless of whether the Secretary has investigated and reported on such derivatives." Panel Op. 13. It may be true that the President *could* have taken action against derivative articles in Proclamation 9705—but he did not. Like the Steel Report, the President's sole focus, including in his instruction to the Secretary to "continue to monitor imports of steel articles," was the threat to national security from imports of primary articles of steel. *See* Appx689.

Moreover, the panel erred when it stated that "[t]here is no textual basis for reading § 232 as empowering the President to [include derivative articles] only at the initial plan-adoption stage, not at later, modification stages." Panel Op. 13. Paragraph (c)(3) of Section 232, the *only* statutory support for presidential action outside the 90-day time limit, allows the President only to "take such other actions as the President deems necessary to adjust the imports of such article," unlike paragraph (c)(1), which allows the President "to take action to adjust imports of an article and its derivatives" within 90 days of receiving the Section 232 report.

– 13 –

### C.    The panel nullified *Transpacific*'s concerns about "staleness"

*Transpacific* expressly distinguished its holding from presidential action based on a Section 232 report that has become "too stale to be a basis for the new imposition." *See* 4 F.4th at 1323. The majority in *Transpacific* had "no genuine concern about staleness" because "Proclamation 9772 ... came only [four] months after [Proclamation 9705], which itself provided for just such a possible change in the future." 4 F.4th at 1332. But Proclamation 9980 was issued *more than two years* after the Steel Report, and more than twenty-one months after Proclamation 9705.

Under *Transpacific*, the panel should have considered whether this delay raised "genuine concern[s] about staleness," especially when considering tariffs on derivative articles that were *not* provided for in Proclamation 9705. Instead, the panel found that "the greater gap in time between the Secretary's finding and the challenged proclamation" did not matter, because "[t]here is no textual basis for a specific time limit on adjustments under a timely adopted plan." Panel Op. 13. But Section 232 imposes very clear time limits on presidential action. *Transpacific* may have pared those limits back, but here the panel discarded them altogether.

The panel erred further in concluding that "the underlying finding or objective" of the Steel Report and Proclamation 9705 had not "become substantively stale" because

> Proclamation 9980 was issued in pursuit of the same goal
> first articulated in Proclamation 9705 (extended stabiliza-
> tion at 80 percent of domestic capacity utilization) and in
> response to the "current information" provided to the Pres-
> ident by the Secretary under the "requirements for moni-
> toring the import reductions" that were "put in place" by
> Proclamation 9705.

Panel Op. 13–14. First, that Proclamation 9980 pursued the same 80-percent capac-

ity-utilization goal as Proclamation 9705 simply begs the question whether that goal—

based on factfinding in the 2018 Steel Report in which capacity utilization was based

on 2017 demand levels, Appx780—was still "fresh" two years later in January 2020.

Second, by relying on the partial "current information" purportedly provided by the

Secretary to the President, the Panel vitiates Section 232's insistence on a public re-

port provided to Congress. Third, this "current information" was *not* provided to the

President pursuant to the monitoring instructions in Proclamation 9705, which

solely concerned import levels of primary steel products.

## III.   THE PANEL'S EXTENSION OF *TRANSPACIFIC* CREATES AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER

Because Section 232 represents an enormous delegation of power to the Presi-

dent, its time limits must be enforced. Without these procedural constraints, a single

Section 232 report would grant the President virtually unbounded power to regulate

imports.

It is undisputed that Section 232 does not substantively limit the President's power to act. The statute contains no meaningful substantive standards regarding the threshold for action or the potential remedial measures that the President can impose. Although Section 232 nominally limits the President's power to adjust imports to instances in which the President concludes that a particular article of commerce threatens "to impair the national security," Section 232(d) defines "national security" broadly to include domestic economic impacts. 19 U.S.C. § 1862(d). In addition, judicial review of the President's actions is effectively unavailable. Despite the Supreme Court's statement that Section 232 does not simply authorize "[a]ny action the President might take, as long as it has even a remote impact on imports," *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 571 (1976), the Court has refused to scrutinize the President's exercise of tariff discretion, *see United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940). In that regard, *Transpacific* may have expressed unwarranted optimism that a court would prohibit presidential action that "ma[d]e no sense except on premises that depart from the Secretary's finding" because the finding was "too stale" or "for other reasons." 4 F.4th at 1323.

Section 232's time limits are effective constraints both because they focus the President's attention on a specific present threat to national security and because they facilitate judicial review of presidential action under Section 232. Deadlines

demand attention, and Congress rationally concluded that adding deadlines to Section 232 would ensure the President's prompt comprehensive action to address an extant threat to national security identified by the Secretary, while limiting mission creep from the President's unrelated policy objectives.

The Supreme Court has recognized that procedural safeguards can save an otherwise broad delegation from unconstitutionality. For example, the Court held in *Touby v. United States* that the statute at issue created a lawful delegation because the "procedural requirements" it imposed "meaningfully constrained the Attorney General's discretion to define criminal conduct." 500 U.S. 160, 166 (1991). Notably, those key procedural safeguards included a finding that action was "necessary to avoid an imminent hazard to the public safety," consideration of "three factors" to make that finding, publication of a "30-day notice of the proposed scheduling [of the substance] in the federal register," and giving notice to and consulting with the Secretary of Health and Human Services. *Id.* at 166–67. Those requirements mirror the procedure—including time limits—of Section 232.

The panel erred in concluding that *Algonquin* disposes of the nondelegation problem. *See* Panel Op. 14–15. In rejecting that challenge to an earlier version of Section 232, the Supreme Court noted that Section 232 "establishes clear preconditions to Presidential action—*inter alia*, a finding by the Secretary that an 'article is

being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.'" *Algonquin*, 426 U.S. at 559 (quoting Section 232). *Algonquin* had no opportunity to address the possibility of stale factfinding, or presidential action unrelated to that factfinding. *Algonquin* addressed Proclamation 4341, 40 Fed. Reg. 3965 (Jan. 27, 1975), which President Ford enacted on the heels of a new Section 232 report by the Secretary. Moreover, President Eisenhower's original Proclamation 3279, 49 Fed. Reg. 1781 (Mar. 12, 1959), which was modified many times leading to Proclamation 4341, from the start covered both crude oil "and the principal crude oil derivatives and products."

Removing Congress's deadlines—allowing presidential action at any time—untethers presidential action from the crucial "clear precondition[ ]" discussed in *Algonquin*. Under the panel's approach, a President could arbitrarily exhume a decades-old Section 232 report to justify new action, trespassing on the constitutional principle that the use of legislative power to "impose current burdens" must "be justified by current needs." *Shelby Cty. v. Holder*, 570 U.S. 529, 542 (2013) (quoting *Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)).

# CONCLUSION

For the reasons above, Plaintiff-Appellees respectfully request that the Court grant this petition, rehear this case *en banc*, and affirm the Trade Court's decision that Proclamation 9980 was issued *ultra vires*.

Respectfully submitted,

PERKINS COIE LLP

/s/ Michael P. House

Michael P. House
Andrew Caridas
Perkins Coie LLP
700 Thirteenth Street, NW
Suite 800
Washington, DC 20005
Phone: (202) 654-6200
Facsimile: (202) 654-6211
Email: MHouse@perkinscoie.com

Karl J. Worsham
2901 N. Central Avenue
Suite 2000
Phoenix, Arizona 85012

*Counsel for Plaintiffs-Appellees*
*Oman Fasteners, LLC,*
*Huttig Building Products, Inc., and*
*Huttig, Inc.*

/s/ Jeffrey S. Grimson

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Sarah M. Wyss
Bryan P. Cenko
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015
Email: trade@mowrygrimson.com

*Counsel for Plaintiff-Appellee*
*PrimeSource Building Products, Inc.*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

1.      This brief complies with the type-volume limitation of Federal Appellate Rule 35(b). Excluding the portions exempted by rule, the brief contains 3806 words as counted by the word-processing software used to prepare it.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Goudy Old Style type for text and 14-point Palatino Linotype for headings.

Dated: April 24, 2023                    /s/ Michael P. House
                                         Michael P. House

# ADDENDUM 1

# United States Court of Appeals
# for the Federal Circuit

_____

**PRIMESOURCE BUILDING PRODUCTS, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES, JOSEPH R. BIDEN, JR.,
PRESIDENT OF THE UNITED STATES, GINA M.
RAIMONDO, SECRETARY OF COMMERCE,
CHRISTOPHER MAGNUS, COMMISSIONER OF
U.S. CUSTOMS AND BORDER PROTECTION,
UNITED STATES CUSTOMS AND BORDER
PROTECTION, DEPARTMENT OF COMMERCE,**
*Defendants-Appellants*

_____

2021-2066
_____

Appeal from the United States Court of International
Trade in No. 1:20-cv-00032-TCS-JCG-MMB, Senior Judge
Timothy C. Stanceu, Judge Jennifer Choe-Groves, Judge
M. Miller Baker

---------------------------------------------------

**OMAN FASTENERS, LLC, HUTTIG BUILDING
PRODUCTS, INC., HUTTIG, INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES, JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, CHRISTOPHER MAGNUS, COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF COMMERCE, GINA M. RAIMONDO, SECRETARY OF COMMERCE,**
*Defendants-Appellants*

————————————

2021-2252

————————————

Appeal from the United States Court of International Trade in Nos. 1:20-cv-00037-TCS-JCG-MMB, 1:20-cv-00045-TCS-JCG-MMB, Senior Judge Timothy C. Stanceu, Judge Jennifer Choe-Groves, Judge M. Miller Baker.

————————————

Decided:  February 7, 2023

————————————

JEFFREY S. GRIMSON, Mowry & Grimson, PLLC, Washington, DC, argued for plaintiff-appellee PrimeSource Building Products, Inc.  Also represented by BRYAN PATRICK CENKO, JILL CRAMER, KRISTIN HEIM MOWRY, SARAH WYSS.

ANDREW CARIDAS, Perkins Coie, LLP, Washington, DC, argued for plaintiffs-appellees Oman Fasteners, LLC, Huttig Building Products, Inc., Huttig, Inc.  Also represented by MICHAEL PAUL HOUSE; KARL J. WORSHAM, Phoenix, AZ.

MEEN GEU OH, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendants-appellants.  Also represented by KYLE SHANE BECKRICH, BRIAN M. BOYNTON, TARA K. HOGAN, PATRICIA M. MCCARTHY.

ADAM H. GORDON, The Bristol Group PLLC, Washington, DC, for amicus curiae The American Steel Nail Coalition. Also represented by LAUREN FRAID, JENNIFER MICHELE SMITH.

————————————

Before TARANTO, CHEN, and STOLL, *Circuit Judges*.

TARANTO, *Circuit Judge*.

In 2018, pursuant to § 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877, codified as amended at 19 U.S.C. § 1862, the Secretary of Commerce reported to the President that steel imports threatened national security by contributing to unsustainably low levels of use of domestic steel-producing capacity, and the President, agreeing with the Secretary's finding, issued Proclamation 9705 to adopt a plan of action to address that threat, starting with imposition of higher tariffs on steel imports from certain countries but providing for monitoring and future adjustments if needed. In 2020, the President issued Proclamation 9980, which, based on the required monitoring, raised tariffs on imports of steel derivatives such as nails and fasteners. That proclamation was challenged in two cases (before us here) filed in the Court of International Trade (Trade Court)—one by PrimeSource Building Products, Inc.; the other by Oman Fasteners, LLC, Huttig Building Products, Inc., and Huttig, Inc. (collectively, Oman Fasteners)—against the United States, the President, and two federal agencies and their heads (collectively, the government). The Trade Court held Proclamation 9980 to be unauthorized by § 232 because the new derivatives tariffs were imposed after the passing of certain deadlines for presidential action set forth in § 232. *See PrimeSource Building Products, Inc. v. United States*, 497 F. Supp. 3d 1333 (Ct. Int'l Trade 2021); *PrimeSource Building Products, Inc. v. United States*, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021); *Oman Fasteners,*

*LLC v. United States*, 520 F. Supp. 3d 1332 (Ct. Int'l Trade 2021).

The government appeals. After the Trade Court issued its decisions on the merits, we decided *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 1414 (2022), which led the Trade Court to issue stays of its judgments in the two cases. In *Transpacific*, we upheld a presidential proclamation that increased tariffs on steel beyond Proclamation 9705's rate, concluding that when the President, within the § 232 time limits at issue, adopts a plan of action that contemplates future contingency-dependent modifications, those time limits do not preclude the President from later adding to the initial import impositions in order to carry out the plan to help achieve the originally stated national-security objective where the underlying findings and objective have not grown stale. We now uphold Proclamation 9980. That proclamation's new imposition reaches imports of steel derivatives, which are within § 232's authorization of presidential action based on the Secretary's finding about imports of steel, and there is no staleness or other persuasive reason for overriding the President's judgment that including derivatives helps achieve the specific, original national-security objective. We therefore reverse the judgments of the Trade Court.

## I

### A

Section 232 "empowers and directs the President to act to alleviate threats to national security from imports." *Id.* at 1311. For the President to act, the Secretary of Commerce must, under § 232(b), first investigate the effects on national security of imports of an article and submit to the President within 270 days a report detailing the Secretary's findings about such effects. 19 U.S.C. § 1862(b)(1)(A)–(3)(A). The report must contain the Secretary's recommendations for action or inaction with respect

to imports of that article. *Id.* § 1862(b)(3)(A). If the Secretary finds that imports of the article "threaten to impair the national security, the Secretary shall so advise the President in [the] report." *Id.* Under § 232(c), within 90 days of receiving the Secretary's report, the President must determine whether to concur in that finding. *Id.* § 1862(c)(1)(A)(i). If the President concurs in that finding, then within the same 90 days "the President shall" also "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article *and its derivatives* so that such imports will not threaten to impair the national security." *Id.* § 1862(c)(1)(A) (emphasis added). If the President determines to take action with respect to the import of the article and its derivatives, "the President shall implement that action" within 15 days of the foregoing determinations, *id.* § 1862(c)(1)(B), that is, within 105 days of the Secretary's report.

## B

In 2017, the Secretary began investigating steel imports and concluded that they posed a threat to national security. J.A. 232–35. On January 11, 2018, the Secretary reported to the President that the imports were "weakening our internal economy" and harming "the [domestic] steel industry," the continued vitality of which "is essential for national security applications." *Id.* The Secretary recommended that the President "take immediate action by adjusting the level of these imports through quotas or tariffs" with the goal of "reducing import penetration rates to approximately 21 percent," so that "U.S. industry would be able to operate at 80 percent of their capacity utilization." J.A. 236, 288. The 80 percent rate, the Secretary found, was the minimum "necessary to sustain adequate profitability and continued capital investment, research and development, and workforce enhancement in the steel sector" and to thereby "enable U.S. steel mills to increase operations significantly in the short-term and improve the

financial viability of the industry over the long-term." J.A. 234, 289.

On March 8, 2018, the President announced his concurrence and remedial plan. Proclamation 9705: Adjusting Imports of Steel into the United States, 83 Fed. Reg. 11,625 (Mar. 8, 2018). He concurred that "steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security." *Id.* ¶ 5, 83 Fed. Reg. at 11,626. He imposed a 25 percent tariff on imports of various steel articles (*e.g.*, flat-rolled products, bars and rods, tubes, pipes, and ingots) from many countries. *Id.* ¶ 8, clause 2, Annex, 83 Fed. Reg. at 11,626–29; *see PrimeSource*, 497 F. Supp. 3d at 1337–38 n.2. The President deemed this an "important first step in ensuring the economic viability of our domestic steel industry." Proclamation 9705 ¶ 11, 83 Fed. Reg. at 11,626; *id.* clause 2, 83 Fed. Reg. at 11,627. He retained the option to "remove or modify" the impositions if the United States and other countries were to come up with suitable alternatives for remedying the security threat. *Id.* ¶ 9, 83 Fed. Reg. at 11,626. More generally, the President directed the Secretary to "continue to monitor imports of steel articles," "review the status of such imports with respect to the national security," and "inform the President of any circumstances that in the Secretary's opinion might indicate the need for further action by the President under section 232." *Id.* clause 5(b), 83 Fed. Reg. at 11,628.

In light of, *e.g.*, negotiations between the United States government and some foreign governments, the President issued a variety of follow-up proclamations to make changes in the impositions of Proclamation 9705, including the August 2018 Proclamation 9772 that was challenged (and upheld by this court) in *Transpacific*. 4 F.4th at 1314–16. The Secretary monitored relevant imports, as required, and in January 2020, the President issued a new proclamation—now covering *derivatives* of the earlier-covered

steel articles—based on information supplied by the Secretary. Proclamation 9980: Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States, 85 Fed. Reg. 5281 (Jan. 24, 2020).[1]

The President recited that the Secretary had informed him that "domestic steel producers' capacity utilization ha[d] not stabilized for an extended period of time at or above the 80 percent capacity utilization level" that was the objective of Proclamation 9705. *Id.* ¶ 5, 85 Fed. Reg. at 5281. The Secretary stated that "imports of certain derivatives of steel articles have significantly increased since the imposition of the tariffs," and "[t]he net effect of the increase of imports of these derivatives has been to erode the customer base for U.S. producers of . . . steel and undermine the purpose of the proclamations adjusting imports of . . . steel articles to remove the threatened impairment of the national security." *Id.* ¶ 5, 85 Fed. Reg. at 5282. The Secretary characterized this increase in imports of steel derivatives as "circumvent[ing] the duties on . . . steel articles imposed in . . . Proclamation 9705" and "threaten[ing] to undermine the actions taken to address the risk to the national security of the United States found in . . . Proclamation 9705." *Id.* ¶ 8, 85 Fed. Reg. at 5282. The Secretary "assessed that reducing imports of the derivative articles" at issue "would reduce circumvention and facilitate the adjustment of imports that . . . Proclamation 9705, as amended, made to increase domestic capacity utilization to address the threatened impairment of the national security of the United States." *Id.* Accepting the foregoing determinations by the Secretary, the President in Proclamation 9980 extended the 25 percent tariff to certain steel derivatives, including nails, staples, and tacks. *Id.* clause 1,

---

[1] The new proclamation covered derivatives of aluminum as well as steel articles, but only the steel aspects of the proclamation are at issue before us.

Annex II, 85 Fed. Reg. at 5283, 5290–92; *see PrimeSource*, 497 F. Supp. 3d at 1338–39 n.3. He "concluded that it [was] necessary and appropriate" to extend the tariffs to the specified steel derivatives "to address circumvention . . . and to remove the threatened impairment of the national security." Proclamation 9980 ¶ 9, 85 Fed. Reg. at 5283.

### C

PrimeSource and Oman Fasteners, which import steel nails and fasteners covered by Proclamation 9980, brought suit in the Trade Court to challenge the proclamation. As relevant now, they contended that the proclamation's extension of the increased tariff to derivatives was contrary to § 232 because it occurred in January 2020, more than 105 days after the President received the Secretary's report. The Trade Court agreed.

The Trade Court in the PrimeSource case concluded that the 90-day and 15-day limits found in § 232(c) apply to the President's imposition of increased burdens on imports under the provision, including modifications of an earlier plan of action that had been timely adopted. 497 F. Supp. 3d at 1343–59. The court held that, insofar as the January 2020 Proclamation 9980 relied on the Secretary's January 2018 report on steel articles to satisfy the § 232(b) prerequisite to presidential action, it was untimely under § 232(c). *Id.* When the government stipulated that it was relying solely on that report to satisfy the § 232(b) prerequisite, the Trade Court held Proclamation 9980 invalid and entered final judgment against the government. *PrimeSource*, 505 F. Supp. 3d at 1353–58. The Trade Court reached the same result in the Oman Fasteners case. 520 F. Supp. 3d at 1335–39.

In both cases, the government timely appealed and also moved for at least a partial stay of the judgment pending appeal. The Trade Court granted stays, reflecting the government's newly enhanced chance of success on the merits in light of the intervening decision of this court in

*Transpacific.  See PrimeSource Building Products, Inc. v. United States*, 535 F. Supp. 3d 1327, 1329–36 (Ct. Int'l Trade 2021); *Oman Fasteners, LLC v. United States*, 542 F. Supp. 3d 1399, 1403–09 (Ct. Int'l Trade 2021).  The Trade Court did, however, note two distinctions of these cases from *Transpacific*—these cases involve an extension to derivatives of a tariff initially imposed on the articles whose importation was found to threaten national security, not (as in *Transpacific*) an increase in rate of the initial tariff on the same articles; and the time from Secretary report to challenged proclamation is much larger than in *Transpacific* (two years versus seven months).  *See PrimeSource*, 535 F. Supp. 3d at 1332–33; *Oman Fasteners*, 542 F. Supp. 3d at 1403–05.  We have jurisdiction over the Trade Court's final judgments under 28 U.S.C. § 1295(a)(5).[2]

## II

On appeal, the government maintains that the Trade Court's decisions are incorrect in light of *Transpacific*.  Appellees defend the Trade Court's decisions, asserting that factual differences render *Transpacific* inapplicable and that the government's reading of § 232 would run afoul of the delegation doctrine.

---

[2]    In *Transpacific*, we flagged the question of whether the claims against the President, as a defendant, must be dismissed.  4 F.4th at 1318 n.5; *accord PrimeSource,* 497 F. Supp. 3d at 1361–62, 1365–70 (Baker, J., concurring in part and dissenting in part).  That question arises here as well.  Based on our recent precedent, we hold that the claims against the President must be dismissed, but given the presence of the other defendants, we have jurisdiction to review the Trade Court's decisions on the merits.  *See USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1366 (Fed. Cir. 2022).

We review the Trade Court's interpretation of the statute de novo. *GPX International Tire Corp. v. United States*, 780 F.3d 1136, 1140 (Fed. Cir. 2015). To the extent relevant here, we may review an allegation that the President acted in violation of the Constitution. *USP Holdings*, 36 F.4th at 1365. For an asserted statutory violation, review is also available, but it is limited: "For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985). This court has repeatedly relied on the *Maple Leaf* formulation to indicate the "limited" scope of review of non-constitutional challenges to presidential action. *USP Holdings*, 36 F.4th at 1365–66 & n.3 (discussing "limited" scope, quoting *Maple Leaf*, and also quoting formulations approving review of whether "the President clearly misconstrued his statutory authority" and "whether the President has violated an explicit statutory mandate" (cleaned up)); *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018).

A

In *Transpacific*, we addressed whether § 232(c)(1) "permits the President to announce a continuing course of action within the statutory time period and then modify the initial implementing steps in line with the announced plan of action by adding impositions on imports to achieve the stated implementation objective." 4 F.4th at 1318–19. We concluded that the President may do so, explaining:

> [T]he best reading of the statutory text of § 1862, understood in context and in light of the evident purpose of the statute and the history of predecessor enactments and their implementation, is that the authority of the President includes authority to adopt and carry out a plan of action that allows adjustments of specific measures, including by

increasing import restrictions, in carrying out the
plan over time.

*Id.* at 1319. And we upheld application of that authority to
an increase in impositions that could have been adopted
initially under § 232(c) where the President had initially
announced a plan of action and later found that an increase
would help solve the specific capacity-utilization problem
that was the basis for the finding that imports threatened
national security. *Id.* at 1310, 1332–33.

Proclamation 9980 comes within the interpretation of
§ 232 we adopted in *Transpacific*. The initial proclamation
(Proclamation 9705) is the same here as in *Transpacific*.
As described above, that proclamation rested on the Secre-
tary's finding that imports of steel articles were threaten-
ing national security by impairing achievement of an 80
percent capacity utilization level found important for do-
mestic steel makers to sustain their operations to meet na-
tional-security needs. J.A. 232–36, 288–89; *see*
Proclamation 9705 ¶¶ 2, 4–5, 83 Fed. Reg. at 11,625–26.
Proclamation 9705 announced a continuing plan of action
aimed at achieving that goal, with monitoring and notice of
possible changes in the future. *Id.* ¶¶ 9, 11, clauses 2, 5(b),
83 Fed. Reg. at 11,626–28 (stating that the President "may
remove or modify the restriction on steel articles imports,"
characterizing "the tariff imposed by this proclamation [a]s
an important first step in ensuring the economic viability
of our domestic steel industry," and directing the Secretary
to "continue to monitor imports of steel articles" and to "in-
form the President of any circumstances that in the Secre-
tary's opinion might indicate the need for further action by
the President under section 232"). Later, the Secretary in-
formed the President that a significant increase had oc-
curred in imports of steel derivatives, which in simple
economic terms constituted a circumvention of the protec-
tions initially adopted to enhance and stabilize domestic
steel-making capacity utilization, undermining the effec-
tiveness of the President's previous tariffs. Proclamation

9980 ¶¶ 5, 8, 85 Fed. Reg. at 5281–82. In response, the President extended Proclamation 9705's tariffs to various steel derivative products to address the circumvention threatening the capacity-utilization objective. *Id.* ¶ 9, clause 1, Annex II, 85 Fed. Reg. at 5283, 5290–92.

Thus, the President, having "announce[d] a continuing course of action within the statutory time period" (Proclamation 9705), "modif[ied] the initial implementing steps . . . by adding impositions on imports" (extending the tariffs to derivatives in Proclamation 9980) "in line with the announced plan of action" (Proclamation 9705's directive to the Secretary to monitor imports and inform the President of any relevant changes) "to achieve the stated implementation objective" (long-term stabilization of the capacity utilization rate at or above 80 percent). *Transpacific*, 4 F.4th at 1318–19. An imposition on imports of derivatives of the articles that were the subject of the Secretary's threat finding is expressly authorized as an available remedy by § 232(c). In acting to close a loophole exploited by steel-derivatives importers, the President was making a "contingency-dependent choice[] that [is] a commonplace feature of plans of action," *id.* at 1321, adding use of a tool that he could have used in the initial set of measures and later found important to address a specific form of circumvention Congress recognized when it authorized coverage of derivatives of the articles whose imports the Secretary found to threaten national security. *See* Oral Arg. at 25:03–26:20 (agreeing that the mechanism linking Proclamation 9980 to Proclamation 9705—foreign steel producers, facing raised tariffs on direct imports, sold steel to foreign derivatives makers not (yet) subject to raised tariffs, impairing market opportunities of domestic steel makers—"is not complicated").

## B

The attempts by PrimeSource and Oman Fasteners to distinguish *Transpacific* to reach a different result here are

unpersuasive.  First, the fact that the Secretary's 2018 report and Proclamation 9705 did not address the effect of imports of derivatives is immaterial.  The President may take action against derivative products regardless of whether the Secretary has investigated and reported on such derivatives.  *See* 19 U.S.C. § 1862(b) (stating that the Secretary's investigation and report focus on an "article"); *id.* § 1862(c)(1)(A)(ii) (empowering the President to then adjust imports of both "the article and its derivatives").  There is no textual basis for reading § 232 as empowering the President to do so only at the initial plan-adoption stage, not at later, modification stages.  And what we recognized in *Transpacific* as serving the "evident purpose" of § 232—permitting the President to act under an announced plan to adjust initial measures over time to reach the initially adopted objective, 4 F.4th at 1323—applies not only to an increase in tariff rates on the same entries but equally to an extension to derivatives of measures initially imposed only on the underlying articles.

Second, the greater gap in time between the Secretary's finding and the challenged proclamation (here, nearly two years; in *Transpacific*, seven months) does not render *Transpacific* inapplicable.  There is no textual basis for a specific time limit on adjustments under a timely adopted plan.  Indeed, impositions under § 232 have on numerous occasions been modified many years after they were first adopted.  *Id.* at 1326–29.

As we noted in *Transpacific*, a different question might be presented where the underlying finding or objective has become substantively stale; here, as in *Transpacific*, we have no occasion to address that issue, because "there is no genuine concern about staleness."  *Id.* at 1332.  Proclamation 9980 was issued in pursuit of the same goal first articulated in Proclamation 9705 (extended stabilization at 80 percent of domestic capacity utilization) and in response to the "current information" provided to the President by the Secretary under the "requirements for monitoring the

import reductions" that were "put in place" by Proclamation 9705. *Id.* at 1332 n.10. And insofar as appellees fault the President for imposing tariffs on some derivatives but not others, and the government for declining to put into the record the updated data the Secretary conveyed to the President, *see* PrimeSource Br. 31–32; Oman Fasteners Br. 38 & n.15, the criticism is meritless. The information at issue is not part of a legally required and legally consequential decision of the Secretary, *cf. USP Holdings*, 36 F.4th at 1366–67, and so we may not second-guess the facts found and measures taken by the President to support his adjustment, *see Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984) (citing *United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940)); *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988); Oral Arg. at 13:45–16:00 (acknowledging that there is no review of the President's pertinent factual and remedial-appropriateness determinations).

## C

Reading § 232 to permit the President to modify an initial plan of action to include derivatives, as he did here, does not render it an unconstitutional delegation. The Supreme Court has already rejected a delegation-doctrine challenge to § 232 (in an earlier form), holding that the "clear preconditions to Presidential action" established by § 232, *e.g.*, a finding by the Secretary regarding the existence of a national-security threat, and consideration by the President of "a series of specific factors," make that authority "far from unbounded." *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 558–60 (1976) (citations omitted). The same is true today, as those "clear preconditions" remain in effect, *id.*, and the President must still consider the statutory factors and act only upon receipt of a report from the Secretary, even if the President possesses the modification authority at issue here, *see* 19 U.S.C. § 1862(b)–(d). Moreover, if § 232 "easily fulfill[ed] th[e] [intelligible principle] test" in 1976, *Algonquin*, 426

U.S. at 559, it also does so now, given that the 1988 amendments, in adding the present deadlines, further defined the congressional delegation of authority to the President. We have rejected the contention that *Algonquin* does not require rejection of a delegation-doctrine challenge to § 232 in its current form. *Transpacific*, 4 F.4th at 1332–33 (citing *American Institute for International Steel, Inc. v. United States*, 806 F. App'x 982, 983–91 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 133 (2020)); *see also USP Holdings*, 36 F.4th at 1365. We see no basis for concluding otherwise here.

## III

In sum, § 232's deadlines did not prevent the President from modifying his initial timely adopted plan of action by issuing Proclamation 9980, and that conclusion does not render § 232 unconstitutional under the delegation doctrine. Because there are no more facts for the Trade Court to find on remand if *Transpacific* controls, as appellees agreed, Oral Arg. at 23:20–25, we reverse the judgments of the Trade Court and remand the cases for entry of judgment against PrimeSource and Oman Fasteners, including dismissal of the claims against the President.

The parties shall bear their own costs.

**REVERSED AND REMANDED**