Consol. Nos. 2021-2066 & 2252

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

PRIMESOURCE BUILDING PRODUCTS, INC.,

*Plaintiff-Appellee*

v.

UNITED STATES, JOSEPH R. BIDEN, JR., President of the United States, GINA M. RAIMONDO, Secretary of Commerce, CHRISTOPHER MAGNUS, Commissioner of the United States Customs and Border Protection, UNITED STATES CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF COMMERCE,

*Defendants-Appellants*

---

OMAN FASTENERS, LLC, HUTTIG BUILDING PRODUCTS, INC., and HUTTIG, INC.,

*Plaintiffs-Appellees*

v.

UNITED STATES, JOSEPH R. BIDEN, JR., President of the United States, GINA M. RAIMONDO, Secretary of Commerce, CHRISTOPHER MAGNUS, Commissioner of the United States Customs and Border Protection, UNITED STATES CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF COMMERCE,

*Defendants-Appellants*

---

Appeals from the United States Court of International Trade in Nos. 20-00032 and -00037, and 20-00045, Judges Timothy C. Stanceu, Jennifer Choe-Groves, and M. Miller Baker

---

DEFENDANTS-APPELLANTS, THE UNITED STATES, *et al.*, RESPONSE TO PETITION FOR REHEARING *EN BANC*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

TARA K. HOGAN
Assistant Director

MEEN GEU OH
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 307-0184
Email: Meen-Geu.Oh@usdoj.gov

June 6, 2022                    Attorneys for Defendants-Appellants

# **TABLE OF CONTENTS**

BACKGROUND ................................................................................2

ARGUMENT ...................................................................................7

    I.      Standard Of Review .................................................................7

    II.    The Panel's Decision That Proclamation 9980 Is A Valid Exercise Of The President's Authority Under Section 232 Is Correct And Consistent With Decisions Of The Supreme Court And This Court .....7

CONCLUSION ...............................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*American Institute for International Steel, Inc. v. United States*,
   806 F. App'x 982 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 133 (2020)..............14

*Federal Energy Administration v. Algonquin SNG, Inc.*,
   426 U.S. 548 (1976)...................................................................... 13, 14

*Oman Fasteners, LLC v. United States*,
   520 F. Supp. 3d 1332 (Ct. Int'l Trade 2021).........................................6

*PrimeSource Building Products, Inc. v. United States*,
   497 F. Supp. 3d 1333 (Ct. Int'l Trade 2021).........................................6

*PrimeSource Building Products, Inc. v. United States*,
   505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021).........................................6

*PrimeSource Building Products, Inc. v. United States*,
   59 F.4th 1255 (Fed. Cir. 2023) ................................................... *passim*

*Transpacific Steel LLC v. United States*,
   4 F.4th 1306 (Fed. Cir. 2021), *cert denied*, 142 S. Ct. 1414 (2022) ........... *passim*

*USP Holdings, Inc. v. United States*,
   36 F.4th 1359 (Fed. Cir. 2022), *cert. denied*, 143 S. Ct. 1056 (2023) .................14

**Statutes**

19 U.S.C. § 1862(b) (1955) .......................................................................1

19 U.S.C. § 1862(b) ......................................................................... *passim*

19 U.S.C. § 1862(c) ......................................................................... *passim*

19 U.S.C. § 1862(d) ............................................................................14

H.R. Rep. No. 745, 84th Cong. 1st Sess. 7 (1955) ....................................1

H.R. Rep. No. 1761, 85th Cong., 2d Sess. 13 (1958) ..................................................1

S. Rep. No. 1838, 84th Cong., 2d Sess. 12 (1958) ..................................................12

**Rules**

Fed. R. App. P. 35(a) ...........................................................................................1, 7

**Federal Register**

*Proclamation 9705,*
    83 Fed. Reg. 11,625 (Mar. 15, 2018)........................................... *passim*

*Proclamation 9772,*
    158 Fed. Reg. 40,429 (Aug. 15, 2018) ........................................ *passim*

*Proclamation 9980,*
    85 Fed. Reg. 5,281 (Jan. 24, 2020)............................................. *passim*

*Section 232 Report,*
    85 Fed. Reg. 40,202 (July 6, 2020).............................................. *passim*

## RESPONSE TO PETITION FOR REHEARING *EN BANC*

Pursuant to Rule 35 of the Federal Rules of Appellate Procedure and of the Rules of this Court, and this Court's May 23, 2023 letter, defendant-appellants, the United States *et al*., respectfully respond to the petition for rehearing *en banc* filed by the plaintiff-appellee, PrimeSource Building Products, Inc., and consolidated plaintiffs-appellees, Oman Fasteners, LLC, Huttig Building Products, Inc., and Huttig, Inc. (collectively, petitioners).

For nearly 70 years, Congress has authorized a procedure by which the President may "adjust [] imports" of products that threaten to impair the "national security."  19 U.S.C. § 1862(b) (1955).  That authority (codified in Section 232 of the Trade Expansion of 1962 (Section 232)) has been iterated in various ways throughout the statute's history, but it has always been understood as conferring the President with "continuing authority," H.R. Rep. No. 745, 84th Cong. 1st Sess. 7 (1955), to "judge national security needs" and to do what is "needed to avoid a threat to the national security through imports," H.R. Rep. No. 1761, 85th Cong., 2d Sess. 13 (1958).

Less than two years ago, this Court confirmed that Section 232's present iteration expresses the long-held view of conferring the President with continuing authority to modify timely implemented measures as necessary to address national security concerns.  *See Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed.

Cir. 2021), *cert denied*, 142 S. Ct. 1414 (2022).  That case involved an initially

implemented Section 232 tariff on steel products and the President's later

adjustment of the measure in Proclamation 9772.  Contesting the President's

continuing authority, importers alleged that Proclamation 9772 was invalid under

the statute.  *Transpacific* rejected that challenge, concluding that "modif[ications]

of the initial implementing steps in line with the announced plan of action by

adding impositions on imports to achieve the stated implementation objective"

were permissible under Section 232.  *Id*. at 1318-19.

Applying the same reasoning as *Transpacific*, the Panel in this case found

that the President's decision to further modify that same initially implemented

trade measure to include derivatives of already-covered products, as specified in

Proclamation 9980, was lawful under Section 232.  The Panel, in doing so,

addressed (and rejected) the statutory arguments that petitioners raise in support of

their petition.  It also rejected petitioners' nondelegation challenge, holding that the

constitutional question had already been answered by the Supreme Court.

Petitioners continue to demur, but the Panel's decision is consistent with

decisions of this Court and the Supreme Court.  *En banc* hearing is unwarranted.

## BACKGROUND

Section 232 "empowers and directs the President to act to alleviate threats to

national security from imports.'"  *Transpacific*, 4 F.4th at 1311.  In order for the

2

President to act, however, the Secretary of Commerce must first investigate the effects on national security of imports of an article and submit to the President a report detailing the findings about those effects.  19 U.S.C. § 1862(b)(1)(A)–(3)(A).  The Secretary must recommend action or inaction with respect to imports of that article, and if the Secretary finds that imports of the article "threaten to impair the national security, the Secretary shall so advise the President in [the] report."  *Id*. at § 1862(b)(3)(A).

Within 90 days of receiving the Secretary's report, the President must determine whether to concur with the Secretary's threat-finding.  *Id.* § 1862(c)(1)(A)(i).  If the President concurs, then within the same 90 days "the President shall" also "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article *and its derivatives* so that such imports will not threaten to impair the national security."  *Id.* § 1862(c)(1)(A) (emphasis added).  If the President determines to take action, "the President shall implement that action" within 15 days of reaching the decision.  *Id.* § 1862(c)(1)(B).

In 2017, the Secretary commenced an investigation on steel imports and their effect on national security.  In January 2018, the Secretary reported to the President that steel imports were "weakening our internal economy and threaten to impair the national security as defined in Section 232."  *Section 232 Report*, 85

Fed. Reg. 40,202 (July 6, 2020).  The Secretary recommended that the President

"take immediate [trade] action" with the goal of "reducing import penetration rates

to approximately 21 percent," so that "U.S. industry would be able to operate at 80

percent of their capacity utilization." *Id*. at 40,225.  The Secretary explained that

this 80 percent rate was the minimum "necessary to sustain adequate profitability

and continued capital investment, research and development, and workforce

enhancement in the steel sector," *id*. at 40,204, and suggested that meeting these

metrics might address the "shrinking ability" of the United States "to meet national

security requirements in a national emergency," *id*. at 40,222.

In March 2018, the President concurred with the Secretary's threat-finding

and issued Proclamation 9705.  That Proclamation imposed a 25 percent tariff on

various steel article imports from most countries, which the President described as

an "important first step" in addressing specified concerns. *Proclamation 9705*, 83

Fed. Reg. 11,625, 11,626-27 ¶ 11 (Mar. 15, 2018).  The President simultaneously

reserved the option "to remove or modify" the restriction if alternatives with some

nations could be arranged, *id*., ¶ 9, and further instructed the Secretary "to continue

to monitor" the situation and "inform [him] of any circumstances that . . . might

indicate the need for further action by the President under section 232," *id*. at

11,628, clause (5)(b).

Over the next two years, the President (through subsequent Proclamations) periodically adjusted his measure, including by doubling the tariff rate for Turkish steel imports by way of Proclamation 9772, which the President viewed as "necessary" because "imports ha[d] not declined as much as anticipated and capacity utilization ha[d] not increased to [] target level[.]" 158 Fed. Reg. 40,429, ¶ 5 (Aug. 15, 2018).

In January 2020, the President issued Proclamation 9980, which also adjusted tariff coverage to include derivatives of already-covered steel articles. *Proclamation 9980*, 85 Fed. Reg. 5,281 (Jan. 24, 2020). The purpose of the Proclamation was to eliminate an exploited loophole in Proclamation 9705. Since implementing Proclamation 9705, the President learned through the Secretary that "imports of certain derivatives of steel articles ha[d] significantly increased," by 23 to 33 percent, signifying that "[f]oreign producers," were "circumvent[ing] the duties on . . . steel articles imposed in . . . Proclamation 9705, and" thus "undermin[ing] the actions taken to address the risk to the national security of the United States" articulated within that Proclamation. *Id*. at 5,281-82, ¶¶ 5-8. The President explained that such "circumvention" and the "net effect of the increase of imports of these derivatives" had "erode[d] the customer base for U.S. producers of . . . steel," and thereby prevented achievement of a stable 80 percent average

domestic capacity utilization rate. *Id.*, ¶¶ 4, 8. The President thus issued Proclamation 9980 to correct the problem.

Petitioners thereafter brought actions in the Court of International Trade alleging that the President exceeded his statutory authority in issuing Proclamation 9980. They asserted that 19 U.S.C. § 1862(c)(1)(B)—which directs the President to take "action"—limits the President to 105 days to implement the *entirety* of his action in response to a specified national security threat, after which the conferred authority automatically expires. Because Proclamation 9980 was implemented after that 105-day period, petitioners argued that the trade adjustment was unlawful. The trial court agreed and declared Proclamation 9980 invalid. *See PrimeSource Building Products, Inc. v. United States*, 497 F. Supp. 3d 1333 (Ct. Int'l Trade 2021); *PrimeSource Building Products, Inc. v. United States*, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021); *Oman Fasteners, LLC v. United States*, 520 F. Supp. 3d 1332 (Ct. Int'l Trade 2021).

On appeal, the Panel reversed the trial court's judgment. Relying upon *Transpacific*, the Panel explained that the President's authority to adjust and modify a timely implemented measure did not cease to exist the moment the time specified in subpart (c) lapsed. *PrimeSource Building Products, Inc. v. United States*, 59 F.4th 1255, 1257 (Fed. Cir. 2023). Rather, it found that the President's decision to timely announce a plan of action and institute monitoring efforts as he

6

did in Proclamation 9705 was permissible under Section 232. *See id*. at 1261. The Panel then upheld Proclamation 9980 because it was simply a modification of Proclamation 9705, in line with the plan and objective that the President had timely disclosed, thereby making it a lawful continuation of a prior action, rather than the inception of a new one. *See id*. at 1261-63. The Panel also rejected the petitioners' nondelegation argument because the Supreme Court has already held that Section 232 is a constitutional delegation of authority. *Id*. at 1263.

## ARGUMENT

### I.    Standard Of Review

"An en banc . . . rehearing is not favored and ordinarily will not be ordered" unless it is necessary to secure or maintain uniformity of the Court's decisions or the case involves a question of "exceptional importance." Fed. R. App. P. 35(a).

### II.   The Panel's Decision That Proclamation 9980 Is A Valid Exercise Of The President's Authority Under Section 232 Is Correct And Consistent With Decisions Of The Supreme Court And This Court

The Panel unanimously concluded that the President did not exceed his Section 232 authority when he issued Proclamation 9980. It explained why its conclusion was consistent with precedent in this Court and with Supreme Court precedent more broadly. The Panel's decision is correct and the request for *en banc* review should be denied.

7

The Panel's statutory analysis primarily turned on *Transpacific*.[1] *Transpacific* involved a challenge to Proclamation 9772, that (like Proclamation 9980) also arose out of Proclamation 9705.  Proclamation 9772 doubled the tariff rate on Turkish steel imports and was issued seven months after the President received the Secretary's report.  Importers contended that Proclamation 9772 was unlawful on the ground that 19 U.S.C. § 1862(c)(1) limited the President to implementing import adjustments within 105-days specified in that subpart of the statute.  *Transpacific*, 4 F.4th at 1318-19.  Because the President had issued Proclamation 9772 outside that timeframe, they contended that the subsequent trade adjustment amounted to an independent "action" lacking a substantiating (and required) report from the Secretary, thus rendering the trade adjustment procedurally invalid.  *See id.*

After conducting a detailed textual, contextual, and historical analysis of the Section 232 statute, *id*. at 1318-31, this Court concluded that "the best reading of the statutory text … understood in the context and in light of the evident purpose of the statute and the history of predecessor enactments and their implementation, is that the authority of the President includes the authority to adopt and carry out a plan of action that allows adjustments of specific measures, including by

---

[1] Petitioners in *Transpacific* sought *en banc* rehearing and petitioned for *writ of certiorari* to the Supreme Court and both petitions were denied.

increasing import restrictions, in carrying out the plan over time," *id*. at 1319.

*Transpacific* thus declared that the course of action announced in Proclamation

9705 was a valid exercise of the President's authority, and thereafter, upheld

Proclamation 9772, recognizing that that later-in-time trade adjustment simply

amounted to a "modif[ication] of the initial implementing steps in line with the

announced plan of action by adding impositions on imports to achieve the stated

implementation objective." *Id*. at 1318-19.  In sum, *Transpacific* found that

Proclamation 9772 was not an independent action, as petitioners contended, but

rather a supportive part of an overall action that was timely implemented through

Proclamation 9705.

The Panel applied the same rationale to the facts of this case and concluded

that "Proclamation 9980 comes within the interpretation of § 232" that this Court

"adopted in *Transpacific*."  *PrimeSource,* 59 F.4th at 1261.  Denoting the

similarity between the two cases, the Panel explained that "[t]he initial

proclamation (Proclamation 9705) is the same here as in *Transpacific*," which

"rested on the Secretary's finding that imports of steel articles were threatening

national security by impairing achievement of an 80 percent capacity utilization

level found important for domestic steel makers to sustain their operations to meet

national-security needs."  *Id*.  The Panel further noted that Proclamation 9705

"announced a continuing plan of action aimed at achieving that goal, with

monitoring and notice of possible changes in the future." *Id*. Then, in reviewing

the scope and purpose of Proclamation 9980, the Panel found that it was a

permissible adjustment as defined by *Transpacific* because it was a

> modif[ication] of the initial implementing steps ... by
> adding impositions on imports (extending the tariffs to
> derivatives in Proclamation 9980) in line with the
> announced plan of action (Proclamation 9705's directive
> to the Secretary to monitor imports and inform the
> President of any relevant changes) to achieve the stated
> implementation objective (long-term stabilization of the
> capacity utilization rate at or above 80 percent).

*Id*. at 1261-62 (citing *Transpacific*, 4 F.4th at 1318-19) (internal quotations

omitted). Ultimately, the Panel found petitioners attempts to distinguish

*Transpacific* "unpersuasive" and rejected their statutory challenge. *Id*.

Petitioners contend that *Transpacific*'s rationale applies only to adjustments

arising out of the same circumstances that purportedly spurred Proclamation 9772,

*i.e.*, failed trade negotiations. Pet. 8-10. That is an inaccurate reading of

*Transpacific*. Nowhere does the decision state (as petitioners contend) that a

permissive "further implementation" can only result from failed trade negotiations.

Rather, *Transpacific* reached its outcome on the ground that the challenged

Proclamation was "a further implementation of Proclamation 9705," and thus did

not constitute an independent "action" pursuant to Section 232. 4 F.4th at 1318.

In fact, *Transpacific* found Proclamation 9772 valid precisely because it (like

Proclamation 9980) "adhered to the basis of the threat finding" in the Secretary's

report, "namely, the need for a particular domestic-plant utilization level." *Id*. The two adjustments, in other words, addressed the same problem, meaning they were rooted in the same cause. That signifies that the *overall purpose* of the originating measure is what drives the relevant inquiry. *Id*. Just as important, in Proclamation 9705, the President stated that he might "remove or modify" his measure and disclosed continued monitoring efforts, *id*. at 1314 (citing Proclamation 9705), thus signifying that Proclamation 9705 was the start of something potentially more comprehensive. These were the factual linchpins of the *Transpacific* decision, and they apply equally here.

Petitioners next contend that *Transpacific* cannot apply because the adjustment at issue here is different in kind, *i.e.*, it extends the tariff to include derivatives of steel articles, as opposed to an increased tariff rate on an already-covered article. Pet. 8-15. In their view, the President's ability to modify is limited to an investigated article, which they say demarks an outer boundary on all subsequent implementations of that action.

But the Panel correctly found that distinction to be "immaterial" and without a "textual basis." *PrimeSource,* 59 F.4th at 1262. "An imposition on imports of derivatives of the articles that were the subject of the Secretary's threat finding is expressly authorized" as a Presidential remedy under Section 232(c) "regardless of whether the Secretary has investigated and reported on such derivatives." *Id*.

11

(comparing 19 U.S.C. § 1862(b)-(c)).  To contend, as petitioners do, that the President must return to the Secretary to refresh his authority simply to cover derivatives of an already-covered article makes no sense when Section 232 does not require that condition for the President to act on derivatives in the first place.

The importers' argument is also undermined by the legislative history.  In 1958, when Congress added the language that authorized the President to adjust imports of derivatives, the Committee Report accompanying the legislation explained why that language was necessary:

> [t]he Finance Committee added language so that adjustments in imports which may threaten the security must be made in the derivatives of raw materials or products as well as the materials or products themselves. The need for such additional language is obvious, for a limitation of the materials alone would serve only to spur the importation of the finished or semi-finished products which are, in the final analysis, the very items most essential to the defense of the country.

S. Rep. No. 1838, 85th Cong., 2d Sess. 12 (1958).  In short, neither the text, context, nor history supports petitioners' reading of the statute.[2]

The Panel also found it meaningful that the President issued Proclamation 9980 "to close a loophole exploited by steel-derivatives importers."  *Id*.  Section

---

[2]  Presidents have on numerous occasions modified import adjustments many years after those trade actions were first implemented. *Transpacific*, 4 F.4th at 1326-29 (giving examples).  An adjustment 21 months after an initial imposition is not an outlier.

232 authorizes "the President to determine 'the nature and duration of the action,'" which is a statutory phrase that "supports, rather than excludes, coverage of a plan implemented over time, including options *for contingency-dependent choices* that are a commonplace feature of plans of action." *Transpacific*, 4 F.4th at 1321 (quoting 19 U.S.C. § 1862(c)(1)(A)(ii)) (emphasis added).  As the Panel observed, "acting to close a loophole exploited by steel-derivatives importers" is precisely the kind of "contingency-dependent choice" contemplated by the statute. *PrimeSource,* 59 F.4th at 1262 (citing *Transpacific*, 4 F.4th at 1321).  On these facts, imposing an extra-textual requirement for the President to obtain a new report on derivatives on an already-covered article would inhibit the President from taking prompt action against circumventers, undermining the statute's "evident purpose." *See id*. (citing *Transpacific*, 4 F.4th at 1323).

Petitioners lastly contend that the Panel's reading and application of Section 232 violates constitutional principles of nondelegation.  Pet. 15-18.

The argument is unpersuasive.  As the Panel recognized, "[t]he Supreme Court has already rejected a delegation-doctrine challenge to § 232 (in an earlier form)." *PrimeSource*, 59 F.4th at 1263 (referring to *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 558-60 (1976)).  Although the statute today bears some differences, the same "clear preconditions to Presidential action" still "remain in effect today." *Id*. (citing 19 U.S.C. § 1862(b)–

(d)).  These "clear preconditions" and "specific factors" that the President must consider are the same ones that the Supreme Court found meaningful in concluding that Section 232 "easily fulfills" the intelligible principles test.  *Algonquin*, 426 U.S. at 559.  Given the Supreme Court's decision on the matter, the Panel correctly saw "no basis for concluding otherwise."  *PrimeSource*, 59 F.4th at 1263.

Congress' later inclusion of timing provisions in subpart (c)(1) of the statute does not change the constitutional calculus.  *See* Pet. at 16-18.  As the Panel noted, the version of the statute that the Supreme Court addressed in *Algonquin* lacked any of the deadlines petitioners mention, *id*., meaning that iteration contained no time-oriented guideposts on Presidential action whatsoever.  Yet, even there, the Supreme Court concluded that excessive delegation was not a close question. *Algonquin*, 426 U.S. at 560 (describing the statute as "far from unbounded" and "easily" fulfilling the intelligible principles test).  The lack of a time-limit on the President to implement the entirety of his action under Section 232 did not raise nondelegation concerns when the Supreme Court reviewed the statute in 1976, nor does it now.

Since 2020, this case marks the fourth time the Court has addressed the matter of nondelegation in the context of Section 232.  *Transpacific*, 4 F.4th at 1332–33; *American Institute for International Steel, Inc. v. United States*, 806 F. App'x 982, 983–91 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 133 (2020); *USP*

*Holdings, Inc. v. United States*, 36 F.4th 1359, 1365 (Fed. Cir. 2022, *cert. denied*, 143 S. Ct. 1056 (2023). Each time, this Court has found the statute to be constitutionally valid pursuant to *Algonquin*. *See id*. Petitioners provide no reason for a different conclusion here.

CONCLUSION

For these reasons, the Court should deny the petition.

> Respectfully submitted,
>
> BRIAN M. BOYNTON
> Principal Deputy
> Assistant Attorney General
>
> PATRICIA M. McCARTHY
> Director
>
> /s/ Tara K. Hogan
> TARA K. HOGAN
> Assistant Director
>
> /s/ Meen Geu Oh
> MEEN GEU OH
> Senior Trial Counsel
> Commercial Litigation Branch
> Civil Division
> Department of Justice
> P.O. Box 480, Ben Franklin Station
> Washington, DC 20044
> Tele: (202) 307-0184
> Email: Meen-Geu.Oh@usdoj.gov

June 6, 2023                    Attorneys for Defendants-Appellants

<u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing brief complies with Federal Rule of Appellate

Procedure 32(a)(7), in that it contains 3,206 words.


June 6, 2023                                              /s/ Meen Geu Oh
                                                         Department of Justice
                                                         P.O. Box 480
                                                         Ben Franklin Station
                                                         Washington, D.C. 20005