Consol. Nos. 2021-2066 & 2252

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

PRIMESOURCE BUILDING PRODUCTS, INC.
*Plaintiff-Appellee*

v.

UNITED STATES, JOSEPH R. BIDEN, JR., President of the United States,
GINA M. RAIMONDO, Secretary of Commerce, TROY MILLER, Acting
Commissioner of U.S. Customs and Border Protection, UNITED STATES
CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF COMMERCE,
*Defendants-Appellants*

---

OMAN FASTENERS, LLC, HUTTIG BUILDING PRODUCTS, INC., and
HUTTIG, INC.,
*Plaintiffs-Appellees*

v.

UNITED STATES, JOSEPH R. BIDEN, JR., President of the United States,
UNITED STATES CUSTOMS AND BORDER PROTECTION,
TROY MILLER, Acting Commissioner of U.S. Customs and Border Protection,
DEPARTMENT OF COMMERCE, GINA M. RAIMONDO,
Secretary of Commerce,
*Defendants-Appellants*

———————————————

Appeals from the United States Court of International Trade in
case nos. 20-00032 and -00037, Judges Timothy C. Stanceu, Jennifer Choe-
Groves, and M. Miller Baker

**MOTION OF PLAINTIFF-APPELLEE PRIMESOURCE BUILDING
PRODUCTS, INC. TO STAY THE MANDATE PENDING PETITION FOR
WRIT OF CERTIORARI**

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Sarah M. Wyss
Bryan P. Cenko
**MOWRY & GRIMSON, PLLC**
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
Tel: 202-688-3610
Email: jsg@mowrygrimson.com
Counsel to PrimeSource Building
Products, Inc.

June 26, 2023

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

**Case Number**   21-2066

**Short Case Caption**   PrimeSource Building Products, Inc. v. United States

**Filing Party/Entity**   PrimeSource Building Products, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/26/2023

Signature:   /s/ Jeffrey S. Grimson

Name:   Jeffrey S. Grimson

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| PrimeSource Building Products, Inc. | N/A | PriSo Acquisition Corporation |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| James C. Beaty<br>Curtis, Mallet-Prevost, Colt & Mosle LLP<br>1717 Pennsylvania Avenue NW #1300, Washington, DC 20006 | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# INTRODUCTION

Plaintiff-Appellee PrimeSource Building Products, Inc. ("PrimeSource") respectfully requests that this Court stay the issuance of the mandate for 90 days, or pending final disposition of any petition for a writ of certiorari that may be filed in this case.  See FED. R. APP. P. 41(d)(2)(B).  A movant "must show that the petition would present a substantial question and that there is good cause for a stay."  Id. 41(d)(1) (emphasis added).  This Court should stay the issuance of its mandate pending final disposition of any petition for writ of certiorari filed by PrimeSource because: 1) this case presents a substantial question concerning separation-of-powers principles, and 2) there is good cause because PrimeSource may be irreparably harmed absent a stay.  Defendant-Appellants the Government has indicated that it opposes the request.  Plaintiff-Appellees Oman Fasteners, LLC et al. consent to this motion.

# BACKGROUND

Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, delegates to the President the power to "adjust the imports of {an} article and its derivatives" when imports of that article "threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii).

The statute provides for certain procedural protections that must be met before the President can adjust imports.  The President can only act following receipt of a

report from the Secretary of Commerce (the "Secretary") that summarizes the findings of the Secretary's investigation into the threat posed to national security by imports of a particular article and makes recommendations to the President for action or inaction. See id. § 1862(b)(3)(A). After receiving the Secretary's report, the President has 90 days to determine whether he will take any action to adjust imports and then 15-days to implement said action. See id. § 1862(c)(1)(A)-(B).

On January 11, 2018, the Secretary issued a Section 232 report finding that imports of steel threatened national security and recommended that President adjust the level of steel imports through quotas or tariffs. See Appx768-1030. The Steel Report covered "steel mill products" but did not mention steel derivative articles.

On March 8, 2018, the President issued Proclamation 9705, which concurred with the Secretary's findings, and imposed tariffs of 25 percent on imports of steel articles. See Appx686-691. The President provided that the "global      tariff . . . would enable domestic steel producers to use approximately 80 percent of existing domestic production capacity." Appx686. The annexes covered by that action did not list any steel derivative articles. See Appx690. The President ordered that the Secretary continue to monitor imports of steel articles and "inform {him} of any circumstances that in the Secretary's opinion might indicate the need for further action." Appx689.

On January 24, 2020, nearly two years after Proclamation 9705, and well beyond the 105-day window for action provided in the statute, the President issued Proclamation 9980, imposing additional tariffs of 25 percent on certain steel derivative articles. See Appx748-760. In the proclamation, the President stated that he imposed additional tariffs on imports of certain steel derivative articles because "domestic steel producers' utilization had not stabilized" at the 80 percent capacity utilization level. Appx748.

Following the issuance of Proclamation 9980, PrimeSource filed an appeal challenging the President's imposition of tariffs on imports of steel derivative articles. See Appx11. The U.S. Court of International Trade ("CIT") awarded summary judgment to PrimeSource holding that the President committed a significant procedural violation of Section 232 by issuing Proclamation 9980 after the 105-day window for Presidential action. See Appx66. The Government appealed the CIT's judgment and the Government's appeal was consolidated with a related appeal in Oman Fasteners, LLC v. United States, 520 F. Supp. 3d 1332 (Ct. Int'l Trade 2021). See PrimeSource Bldg. Prods. v. United States, 59 F.4th 1255, 1257 (Fed. Cir. 2023).

After the CIT issued its judgement relevant to this appeal, the Court held in a related case, Transpacific Steel LLC v. United States, 4 F.4th 1306 (Fed. Cir. 2021), cert. denied, 142 S. Ct. 1414 (2022), that the President did not violate Section 232

by increasing the 25 percent global tariff on steel articles to 50 percent for Turkey four months later.  See 4 F.4th at 1333.  The majority in <u>Transpacific</u> deemed that action lawful, despite being taken after the 105-day window for Presidential action, because it was part of "a continuing course of action" that "modified the initial implementing steps {of Proclamation 9705} in line with the announced plan of action."  <u>Id.</u> at 1324.  The majority held that its opinion was narrow and did "not address other circumstances that would present other issues about presidential authority to adjust initially taken actions without securing a new report with a new threat finding from the Secretary."  <u>Id.</u> at 1310.

Following the Court's holding in <u>Transpacific</u>, the panel reversed the CIT's judgment relevant to this appeal and upheld Proclamation 9980.  <u>See</u> <u>PrimeSource</u>, 59 F.4th 1255, 1257 (Fed. Cir. 2023).  The panel found that the steel derivative articles targeted by Proclamation 9980 fell within the prior "authorization of presidential action {initiated by Proclamation 9705} based on the Secretary's finding about imports of steel" and that "including derivatives helps achieve the specific, original national-security objective."  <u>Id.</u>  The Court held that there was "no staleness or other persuasive reason for overriding the President's judgment."  <u>Id.</u>

On June 22, 2023, the Court denied PrimeSource's and Plaintiff-Appellees' Oman Fasteners, LLC's, Huttig Building Products, Inc.'s and Huttig, Inc.'s joint petition for rehearing <u>en banc</u>.  <u>See</u> Order (June 22, 2023), ECF No. 98.

PrimeSource intends to petition for a writ of certiorari of the panel's judgment and, accordingly, respectfully requests that this Court stay issuance of its mandate.

## ARGUMENT

In determining whether a substantial question exists and if there is a good cause for a stay under Federal Rule of Appellate Procedure 41, the Court examines the following conditions adopted by the Supreme Court:

> (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay.

American Axle Manufacturing v. Neapco Holdings LLC, 977 F.3d 1379, 1380 (Fed. Cir. 2020) (quoting Hollingsworth v. Perry, 558 U.S. 183, 190 (2010)).  The first two criteria concern whether there is a substantial question while the third criteria relates to whether there is good cause for a stay.  "{I}n close cases . . . the Court will balance the equities and weigh the relative harms to the applicant and to the respondent." Am. Axle & Mfg., 977 F.3d at 1380 (quoting Hollingsworth, 558 U.S. at 190). PrimeSource meets all of these criteria, and a stay is warranted.

## I.    PRIMESOURCE'S PETITION RAISES A SUBSTANTIAL QUESTION

The questions to be presented in the petition for a writ of certiorari are as follows: First, whether separation-of-powers principles require courts to resolve ambiguity in the statutory limits on delegations of vast legislative power to the

5

President in a way that constrains the delegation or, as the panel holds, courts must uphold the President's claim of authority unless there has been a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." PrimeSource, 59 F.4th at 1260 (quoting Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985)). Second, whether the President lawfully imposed tariffs on steel derivative articles under Section 232 more than two years after the Secretary issued the relevant Section 232 report, even though neither that report nor any of the President's prior actions pursuant to that report included steel derivative articles.

Here, there is a "reasonable probability" that certiorari will be granted and a "fair prospect" of reversal given that the panel ignored bedrock separation-of-power principles by resolving any ambiguities in Section 232 in favor of the President's view of the statute's limits on his own authority. When the proper standard of review is applied, it is clear that the President acted unlawfully by imposing tariffs on steel derivative articles under Proclamation 9980 outside of the 105-day window for presidential action provided for in Section 232.

### A. There Is a Reasonable Probability that Certiorari Will Be Granted

Given the Supreme Court's recent interest in revisiting separation-of-powers principles, including the major questions doctrine, there is a reasonable probability that certiorari will be granted for the Supreme Court to provide further guidance on

the proper standard of review for resolving ambiguities in statutes delegating vast legislative power to the Executive Branch.

The panel's holding in this case provides the President with near unbridled authority to regulate imports — a power reserved under the Constitution to Congress. See U.S. Const. art. I, §8, cl. 1 & cl. 3. The Supreme Court has developed a family of doctrines designed to protect separation-of-powers principles. In the most extreme cases, a transfer of legislative power to the Executive may be so expansive and unguided that the courts are compelled to directly declare it an unconstitutional delegation. See, e.g., A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495 (1935). More recently, the Supreme Court has applied the "major questions" doctrine where "the history and the breadth of the authority that {the Executive} has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." West Virginia v. EPA, 142 S. Ctr. 2587, 2608 (2022) (cleaned up). In those "extraordinary cases," the Executive's claim of power can prevail only if it can "point to 'clear congressional authorization.'" Id. at 2614 (internal citation omitted).

Section 232 provides for very few limits on the President's authority to adjust imports because it provides for an expansive definition of a threat to national security and places no limits on the type of action that the President can take to adjust imports.

7

See 19 U.S.C. §§ 1862(c)(1)(A)(ii);1862(d).  Instead of substantive limitations, Section 232 places procedural limitations on the President's authority to act.  The President can only act following receipt of a report from the Secretary making an affirmative finding of threat.  See id. § 1862(b)(3)(A).  The President then has a 105-day window to decide on and implement a plan of action to adjust imports of an article and its derivatives.  See id. § 1862(c)(1)(A)-(B).

Strict enforcement of Section 232's procedural requirements is particularly important to maintaining constitutional order.  The inclusion of procedural requirements can prevent a statute from suffering separation-of-powers concerns by limiting the discretion granted to the Executive.  See Touby v. United States, 500 U.S. 160, 166 (1991).  The procedural requirement that the Secretary must make an affirmative finding of threat pursuant to a report before the President can act was one of the main reasons that the Supreme Court previously concluded that Section 232 did not suffer from a delegation problem.  See Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 559 (1976).  The Supreme Court in Algonquin, however, did not address the possibility of stale fact-finding when the President acted outside of the time limits in Section 232 or presidential action that was unrelated to that fact-finding when the President acted on entirely different set of products.  See 426 U.S. at 559-60.  Algonquin addressed Proclamation 4341, 40 Fed. Reg. 3965 (Jan. 27, 1975), issued by President Ford, a proclamation enacted on the heels of a new

8

Section 232 report by the Secretary.  See id.  Moreover, President Eisenhower's original Proclamation 3279, 49 Fed. Reg. 1781 (Mar. 12, 1959), which was modified many times leading to Proclamation 4341, from the start covered both crude oil "and the principal crude oil derivatives and products."  Id.  The Supreme Court in Algonquin was not confronted with a situation where affirming the President's actions would conflict with the timing provisions in Section 232 or the underlying threat to national security originally identified in the Secretary's report.

Such a situation exists here.  In PrimeSource, the panel applied a standard of review that resolved any ambiguity in Section 232 in favor of extending Congress's already expansive delegation of legislative trade powers to the President.  The panel's holding that the President may ignore the procedural protections provided for in Section 232 if he announces a "continuing course of action with the statutory time period and then modify the initial implement steps in line with the announced plan of action," PrimeSource, 59 F.4th at 1261 (quoting Transpacific, 4 F.4th at 1318-19), ignores the Supreme Court's premise in Algonquin – that the statute "establishes clear preconditions to the Presidential action," such as the prerequisite report from the Secretary's investigation.  426 U.S. at 559.  As now construed by the panel in PrimeSource, the President may legislate tariffs against goods that were not the subject of any investigation or recommendation by the Secretary, i.e. steel derivative articles, years after the initial Section 232 steel report, through whatever deliberative

9

process he chooses.  See 59 F.4th at 1261-62.  This interpretation of Section 232 cannot be reconciled with recent cases where the Supreme Court has applied the major questions doctrine to protect the Constitution's division of authority between the political branches.  See West Virginia, 142 S. Ct. at 2609.  The Supreme Court need not overrule Algonquin to recognize that Section 232 raises separation-of-powers concerns under the major questions doctrine sufficient to require that courts find clear congressional authorization before construing the statute in ways that expand the scope of the President's delegated authority.  See id.

Recently, the Supreme Court has expressed a willingness to "reconsider the approach {it has} taken for the past 84 years" concerning its application of separation-of-powers principles in an appropriate case.  Gundy v. United States, 139 S. Ct. 2116, 2131 (2019) (Alito, J., concurring in the judgment); see also id. (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting) (calling the Supreme Court's modern non-delegation approach "an understanding of the Constitution at war with its text and history"); Paul v. United States, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting denial of certiorari) ("Justice Gorsuch's thoughtful Gundy opinion raised important points that may warrant further consideration in future cases.").  The Supreme Court's grant of certiorari to revisit Chevron v. NRDC, 467 U.S. 837 (1984) is an additional indication that the high court is concerned with excessive judicial deference to the Executive Branch.  See

10

Loper Bright Enterprises v. Raimondo, 45 F.4th 359 (D.C. Cir. 2022), cert. granted 91 U.S.L.W. 3277 (U.S. May 1, 2023) (No. 22-451) (granting certiorari to consider the appropriate standard for deferring to an Executive agency's interpretation of its own statutory powers under the Chevron doctrine).

Given that a total of five justices have stated their desire to revisit the Supreme Court's application of separation-of-powers principles, there is a reasonable probability that the Supreme Court will grant certiorari. The panel's interpretation of Section 232 provides the President with near unbridled authority over foreign Commerce making this case an ideal vehicle for the Supreme Court to clarify the proper rules for resolving ambiguities in statutes delegating expansive legislative power to the President.

### B. There Is a Fair Prospect of Reversal

In granting a stay of judgment from the district court, the Supreme Court provided that the standard for deciding whether to grant a stay is not "certainty" but instead whether there is a "fair prospect of reversal." Karcher v. Daggett, 455 U.S. 1303, 1306 (1982). In PrimeSource, the CIT properly determined that Proclamation 9980 was "invalid as contrary to law" because the President issued Proclamation 9980 outside of the 105-day window for Presidential action. Appx66. Relying on its holding in Transpacific, the panel here reversed the CIT and found that the President lawfully implemented a continuing plan of action in Proclamation 9980

that tied back to the original goal of imposing tariffs on steel products to achieve a threshold of 80 percent domestic capacity utilization. See PrimeSource, 59 F.4th at 1261-62. There is a fair prospect of reversal at the Supreme Court because the panel mistakenly found the holding in Transpacific to be controlling and abandoned the limitations on presidential power identified in Transpacific that distinguished that case from this appeal. See id. at 1262-63. By applying the same deferential standard of review as the Court did in Transpacific to also conclude that the President may ignore the timing provisions in Section 232, the panel treaded upon the separation-of-powers principles central to our constitution. When the proper standard of review is applied, it is clear that the procedural preconditions in Section 232 serve as mandatory limits on the President's authority to act to adjust imports.

The panel incorrectly relied on the Court's holding in Transpacific that Section 232 permits the President to "announce{} a continuing course of action with the statutory time period" and then "modify{} the initial implementing steps in line with the announced plan of action." PrimeSource, 59 F.4th at 1261-62 (quoting Transpacific, 4 F.4th at 1318-19). Transpacific was not controlling because the facts in that case are distinguishable from this appeal. The President justified imposing additional tariffs on steel derivative articles because the current duties on steel articles had not resulted in meeting the goal identified in Proclamation 9705 of adjusting imports of steel to reach an 80 percent domestic capacity utilization

threshold. <u>See</u> Appx748. In holding that Proclamation 9980 represented a modification of the announced plan of action in Proclamation 9705, the panel confused the identified goal of reaching an 80 percent domestical capacity utilization with the President's identified plan of action to conduct further negotiations with other countries to reach this goal. <u>See PrimeSource</u>, 59 F.4th at 1261-62. In Proclamation 9705, as part of his plan of action, the President also tasked the Secretary with "monitor{ing} imports of <u>steel articles</u>." Appx689 (emphasis added). The President did not adjust the tariff imposed by Proclamation 9705 on primary steel articles, but instead imposed tariffs in Proclamation 9980 on derivative steel articles. <u>See</u> Appx750. There is no reasonable reading of the record that Proclamation 9980 represents a continuing course of action given that the President's imposition of tariffs on steel derivative articles was unrelated to ongoing negotiations or the threat to national security posed by articles of steel as identified in Proclamation 9705.

The holding in <u>Transpacific</u> was also not controlling on this appeal because the President's imposition of tariffs on steel derivative articles under Proclamation 9980 falls under the staleness and "other reasons" exceptions identified by the Court in <u>Transpacific</u> where Presidential action outside of the 105-day window may be unlawful. <u>See</u> 4 F.4th at 1323. The record contains no evidence to support the President's statement that he acted in Proclamation 9980 based on the Secretary

informing him that imports of steel derivative articles had increased, and that domestic capacity had not stabilized at the 80 percent domestic capacity utilization threshold.  See Appx748-749; see also Appx64 (stating the Government's position was the "procedural preconditions" were met by the Steel Report).    That Proclamation 9980 pursued the same 80 percent domestic capacity utilization goal listed in Proclamation 9705 begs the question whether that goal, grounded on factfinding from the 2018 Steel Report where capacity utilization was based on 2017 demand levels, was still fresh two years later in January 2020.  See Appx780-781 (showing the Steel Report relied on data from 2017).  The President's reliance on outdated information from the Steel Report untethered his action from the Secretary's underlying threat finding.   In terms of "other reasons," Proclamation 9980 was also untethered from the Secretary's finding because the President departed from the key findings in the Steel Report by applying duties for the first time against an entirely different set of products not previously subject to the original Section 232 investigation.  See Appx749-750.  There is a fair prospect of reversal because the panel unlawfully abandoned the limitations in Transpacific that are applicable to this appeal where the President cannot take action to adjust imports outside of the 105-day window mandated in Section 232.

Not only is Transpacific not controlling, but more broadly, the deferential standard of review applied by the Court in Transpacific and the panel in this appeal

14

provides the President with almost unbridled authority over a tariff power that is reserved to Congress by the Constitution. Instead of resolving any ambiguity in Section 232 in favor of limiting the already expansive authority delegated to the President, the panel instead relied on the holding in Transpacific and deferred to the President's interpretation of his own authority. See PrimeSource, 59 F.4th at 1261-62. Such a standard of review conflicts with the Supreme Court's recent application of the major questions doctrine that is designed to protect the separation-of-powers principles that are central to our constitution. See West Virginia, 142 S. Ct. at 2609. Given Section 232's vast delegation of legislative powers, the President's claimed authority to legislate tariffs on steel derivative articles in this case should not have been accepted absent "clear congressional authorization." Id.

Section 232 lacks such "clear congressional authorization." The plain language and legislative history of Section 232 mandate that the President may not act outside of the 105-day window provided for in Section 232. See Appx19-29. Concerning the plain language of the statute, Section 232 specifically contemplates the possibility that the President might decide later that some "other actions" or "additional actions" are needed to achieve his objectives if he negotiates an agreement that limits or restricts imports or exports with another country. 19 U.S.C. § 1862(c)(3)(A)(ii). As the CIT correctly held, by expressly providing for one circumstance in which the President was not required to repeat the investigation

before imposing an alternative action, Congress made clear no other exception was contemplated.  See Appx23-25.  Concerning the legislative history of Section 232, the panel brushed aside the 1988 amendments, which were added after Algonquin, that removed the President's continuing authority to act outside of mandatory time constraints.  See PrimeSource, 59 F.4th at 1263.  The panel's reliance on the Court's refusal in Transpacific to construe the 1988 amendments as effecting "a withdrawal of previously existing presidential power" absent "a clear indication from Congress," 4 F.4th at 1329, is incompatible with the proper standard for interpreting a statute delegating vast legislative powers to the Executive.  As the CIT correctly held, "the 1988 amendments unambiguously placed time limits on the President's authority to adjust imports of derivatives as well as the imports of the investigated article."  Appx26.  Both the plain language and legislative history of Section 232 mandate that the President cannot adjust imports outside of the 105-day window.

For these reasons, there a "fair prospect" of reversal because that the panel incorrectly determined that the Court's holding in Transpacific was controlling on this appeal and there was no clear indication that Congress intended to provide the President with continuing authority to act outside of the 105-day window.  The panel wrongly reversed the CIT's holding that the President acted unlawfully when he imposed tariffs on steel derivative articles under Proclamation 9980 outside of the mandatory time constraints present in Section 232.

16

## II.    THERE IS GOOD CAUSE TO STAY THE MANDATE

A "motion to stay the mandate should advance reasons for the stay beyond the mere intention to apply for certiorari" such as the need for a "remedial order of the Supreme Court if the writ of certiorari were granted." FED. CIR. R. 41 (practice notes). Here, barring a stay, such a remedial order would be needed because PrimeSource will be irreparably harmed as the liquidation of its entries may moot its appeal to the Supreme Court.

"{O}nce liquidation occurs, a subsequent decision by {a court} . . . can have no effect on the dumping duties assessed." SKF USA, Inc. v. United States, 512 F.3d 1326, 1329 (Fed. Cir. 2007). The liquidation of an entry renders "a court action moot" because the court is without remedy as "an importer's liability has been finalized." Id.; see also Sunpreme Inc. v. United States, 2017 Ct. Int'l Trade LEXIS 1, *8 (Jan. 5, 2017) (finding that a defendant would be irreparably harmed if its entries subject to appeal liquidated).[1]

Absent a stay, PrimeSource's entries will likely liquidate before the Supreme Court decides PrimeSource's appeal. The Court will issue its mandate on June 29, 2022. See FED. R. APP. P. 41(b). Once the CIT removes suspension of liquidation

---

[1] There is contrary court precedent that liquidation of an entry does not moot judicial review. See, e.g., Shinyei Corp. of Am. v. United States, 355 F.3d 1297, 1312 (Fed. Circ. 2004) (holding that the finality of liquidation under 19 U.S.C. § 1514 does not "preclude judicial enforcement of court orders after liquidation").

on PrimeSource's entries, CBP must liquidate those entries within six months. See 19 U.S.C. § 1504(d). Otherwise, PrimeSource's entries will be deemed liquidated absent suspension for some other reason. See id. Whether by CBP action or inaction, PrimeSource's entries will liquidate absent a stay. A stay will preserve the status quo while PrimeSource pursues its legal rights.

PrimeSource has 90 days following the Court's rejection of its petition for rehearing en banc on June 22, 2023 to appeal the panel's judgment to the Supreme Court, and this deadline may be extended by an additional 60 days. See SUP. CT. R. 13.1-13.5. Further, any other party will have 30 days to file a brief in opposition to PrimeSource's petition and this deadline is often extended. See R. 15.1-15.3. Barring a stay, PrimeSource's entries will likely liquidate prior to the Supreme Court having even decided whether to grant PrimeSource's petition for a writ of certiorari and certainly prior to the Supreme Court deciding any appeal.

In requesting a motion for partial stay of the judgment at the CIT in this appeal, the Government argued that it would be irreparably harmed because "once {PrimeSource's} entries are liquidated, any claim as to the correct duties owed on PrimeSource's entries could become moot." Defs' Mot. for Partial Stay of J. to Maintain the Status Quo Pending Appeal at 9, PrimeSoure Bldg. Prods. v. United States, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021) (CIT No. 20-00032), ECF No. 114. The Government acknowledged that: "in three recent cases, the Government,

relying on {<u>Shinyei</u>}, represented that reliquidation of otherwise final entries is available in appropriate circumstances in a case brought pursuant to 28 U.S.C. 1581(i)." <u>Id.</u> at 10, n. 2.   But the Government stated that "{a}fter careful consideration, that is no longer the view of the Department of Justice." <u>Id.</u>   In granting the partial motion for stay, the CIT found that the Government had otherwise demonstrated irreparable harm and, therefore, "{it} need not, and d{id} not, consider whether the finality of liquidation itself constitutes potential harm to the United States."   Appx73.   CBP will likely be instructed to liquidate PrimeSource's entries following the issuance of the Court's mandate on June 29, 2022.  Given the Government's position that reliquidation is not permitted in this appeal, such instructions could ultimately moot PrimeSource's appeal to the Supreme Court thereby rendering it irreparably harmed absent a stay of the mandate.

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR A STAY

Even though this case presents a substantial question and there is good cause for a stay, the balance of the equities and public interest also weigh in favor of staying the mandate.  The Government's interest in collection of Section 232 duties from PrimeSource is fully secured, whereas PrimeSource may be denied relief once its entries have liquidated.  Because the government will be made whole in any event,

the public interest also favors staying the mandate to ensure the proper application of Section 232.

The balance of the equities favor PrimeSource because the history of cooperation between PrimeSource and the Government demonstrates that the Government's interest in any duties ultimately owed by PrimeSource is fully secured. In granting PrimeSource's motion for a preliminary injunction, the CIT ordered that PrimeSource "terminate its existing continuous bond and replace it with a continuous bond with a total limit of liability . . . to reflect the additional Section 232 duties PrimeSource anticipates it would otherwise have had to deposit over the next prospective six month period." Order at 2, <u>PrimeSoure Bldg. Prods. v. United States</u>, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021) (CIT No. 20-00032), ECF No. 38. Pursuant to this order, PrimeSource has put in place a new bond on numerous occasions to fully secure the Government's interest. <u>See, e.g.</u>, Joint Status Report at 2, <u>PrimeSoure Bldg. Prods. v. United States</u>, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021) (CIT No. 20-00032), ECF No. 95 (Nonconfidential Version). Although the injunction terminated after the CIT's initial judgment in favor of PrimeSource, the CIT subsequently granted the Government's motion for partial stay of judgment to maintain the status quo pending the issuance of the mandate by this Court. <u>See</u> Appx72-73. In enjoining the Government from liquidating entries affected by this litigation, the CIT required that PrimeSource and the Government reach an

20

agreement on a monitoring system to secure the Government's interest in any future duty payments that PrimeSource may owe.  See id.  PrimeSource and the Government came to an agreement whereby PrimeSource would put in place a new continuous bond to "secure the total amount of foregone duty deposits plus lawful interest entries of its merchandise within the scope of Proclamation 9980 that have occurred, and will occur, on and after {the Court granted the motion for partial stay}" and a "supersedeas bond" to cover entries between the termination of the preliminary injunction and subsequent order granting the motion for partial stay.  Joint Notice Regarding Court's Order Concerning Monitoring and Continuous Bonding at 2, PrimeSoure Bldg. Prods. v. United States, 505 F. Supp. 3d 1352 (Ct. Int'l Trade 2021) (CIT No. 20-00032), ECF No. 128.  The Government's interest in any duties owed by PrimeSource is fully secured by PrimeSource's continuous bond and the monitoring arrangement described above.  See id.

Staying the issuance of the mandate will merely maintain the status quo pursuant to the current partial stay at the CIT which is the precise protection already requested and obtained by the Government.  PrimeSource's cooperation with the Government demonstrates that it will continue to secure the Government's interest pursuant to the stay at the CIT if this Court stays the issuance of the mandate. Contrary to any speculative claims by the Government regarding its future ability to obtain any duties that may be owed to it by PrimeSource, PrimeSource's concern

that it will be irreparably harmed if the mandate is not stayed is imminent and cannot be undone by a future order from the Supreme Court. That liquidation is final and irreversible is precisely the position previously espoused by the Government.

Finally, the public interest favors that "governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." Am. Signature, Inc. v. United States, 598 F.3d 816, 830 (Fed. Cir. 2010). Any interest the Government may assert in protecting its revenue with respect to PrimeSource, which is already fully secured, is secondary to the public interest in ensuring the lawful operation of Section 232 and protection of the separation-of-powers principles that are central to our Constitution.

## CONCLUSION

For the forgoing reasons, PrimeSource respectfully requests that this Court grant this motion to stay the issuance of the mandate for 90 days or until the Supreme Court's final disposition of any petition for a writ of certiorari filed.


Respectfully submitted,


June 26, 2023                          /s/ Jeffrey S. Grimson

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Sarah M. Wyss
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
jsg@mowrygrimson.com
202-688-3610 (ph)

*Counsel for PrimeSource Building Products, Inc.*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 21-2066

**Short Case Caption:** PrimeSource Building Products, Inc. v. US

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 5,191 words.

- ☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

- ☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/26/2023

Signature: /s/ Jeffrey S. Grimson

Name: Jeffrey S. Grimson